BOARD OF EDUCATION OF SCHAUMBURG COMMUNITY CONSOLIDATED SCHOOL DISTRICT No. 54, Petitioner-Appellant, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD et al., Respondents-Appellees.

First District (5th Division) No. 1—91—1505

Opinion filed May 28, 1993.

440

Vedder, Price, Kaufman & Kammholz, of Chicago (James C. Franczek, Jr., and Andrea R. Waintroob, of counsel), for petitioner.

Roland W. Burris, Attorney General, of Springfield (Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Michael H. Slutsky, of Cotton, Watt, Jones & King, of Chicago, for respondent Schaumburg Education Association IEA/NEA.

JUSTICE COUSINS delivered the opinion of the court:

Petitioner/appellant, Board of Education of Schaumburg Community Consolidated School District No. 54 (District), appeals a final administrative order entered against it by respondent/appellee Illinois Educational Labor Relations Board (Board). The Board, in affirming in part and reversing in part the hearing officer's recommended decision and order, stated that (1) the District violated sections 14(a)(1) and 14(a)(3) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(3)) by reassigning Beverly Gorski (Gorski) to another grade, (2) the District violated section 14(a)(1) of the Act by transferring Kay Wojcik (Wojcik) to another school, and (3) the District violated section 14(a)(1) of the Act by issuing Mary Beth Roemer (Roemer) a letter on her teaching performance. The Board further found that the District did not violate section 14(a)(3) of the Act by transferring Wojcik or by issuing the letter to Roemer. In addition, the Board found that the District did not violate section 14(a)(1) by engaging in unlawful surveillance.

The issues presented for review are (1) whether the Board's ruling that the District took adverse action against teachers Wojcik and Roemer because they engaged in activity protected by section 3(a) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1703(a)) is based on an over-

broad and erroneous interpretation of the Act and is contrary to the manifest weight of the evidence, (2) whether the Board's ruling that the District reassigned teacher Gorski because she engaged in union activities is based on a misapplication of the burden of proof and is contrary to the manifest weight of the evidence and the law, and (3) whether the remedy ordered by the Board is excessive and overbroad.

We affirm in part and reverse in part.

FACTUAL AND PROCEDURAL BACKGROUND

The Schaumburg Education Association IEA/NEA (Association) is the exclusive bargaining representative of the District's employees. The District employs approximately 1,000 teachers at 26 schools, including Blackwell Elementary School (Blackwell). A collective bargaining agreement between the parties was effective from the 1987-88 school year through the 1989-90 school year.

Dr. Bernard Lucier (Lucier) became the principal of Blackwell at the beginning of the 1985-86 school year. His predecessor had been reassigned to the classroom, in part, as a result of teacher complaints about him. At the time Lucier was assigned to Blackwell, the school was divided into two camps.

Lucier's primary charge was to try to heal the divisions at Blackwell. In order to improve school climate, during the 1985-86 school year, Lucier, along with District Superintendent Kritzmire and a consultant, decided to form a team mainly composed of the most influential Blackwell teachers. The team, which included Wojcik and Roemer, was called the Principal's Advisory Council. Wojcik and Roemer had opposed the previous principal.

Sometime in April 1989, a teacher approached Association building representative and Blackwell teacher Gorski and complained that Lucier had not told her how she could improve her performance when he evaluated her. Other teachers joined in the discussion about the evaluation process. After speaking to Association president William Eliasek (Eliasek), Gorski decided to conduct a survey. She distributed notices of an Association meeting at which the survey would be conducted.

On April 25, 1989, an Association meeting was held in Gorski's classroom, with Wojcik and Roemer among those present. As the teachers entered the meeting, Gorski and Wojcik saw Lucier standing in the hallway nearby.

Lucier often walked around the hallways to check the condition of the school. On April 25, 1989, Lucier noticed a group of teachers entering Gorski's classroom. He was surprised because he assumed that

a different meeting was taking place. He asked where the teachers were going, a teacher responded that the reading meeting was shortened for an Association meeting, Lucier replied "okay," and walked back to his office. The record is not clear whether Lucier saw Wojcik and Roemer attending the meeting.

Gorski and Association building representative Heather Gabryelewicz (Gabryelewicz) conducted the meeting. Gorski asked the teachers to complete a questionnaire. The questionnaire was designed to determine the teachers' feelings about the evaluation process. Wojcik and Roemer completed the questionnaire during the meeting and returned it to Gorski.

On May 1, 1989, Gorski and Gabryelewicz presented a summary of the questionnaire responses to Lucier. Lucier explained why he did not put comments in the "area(s) for improvement" sections of the evaluations, but agreed to take the questionnaire requests under advisement.

After meeting with Lucier, Gorski and Gabryelewicz distributed notices of another Association meeting which was held on May 4, 1989, in Gorski's classroom. Wojcik and Roemer were present. Lucier was not aware of the meeting.

At the May 4, 1989, meeting, Gorski and Gabryelewicz told the teachers about their discussion with Lucier and the results of the questionnaire. Gorski said that there might be a meeting with Lucier, one of the District's superintendents, and Association president Eliasek to further discuss evaluations.

Roemer, along with Blackwell teacher Cathy Werner (Werner), made some comments at the meeting. Wojcik testified that she did not make any comments at the meeting because she did not want to appear to be a leader. Lucier was not aware of Roemer's comments.

INVOLUNTARY REASSIGNMENT OF BEVERLY GORSKI

Lucier had been concerned for some time about the closeness with which Gorski and another second-grade teacher, Penny Ackman (Ackman), worked. Gorski and Ackman had taught second grade for 9 and 10 years, respectively, and had consistently indicated second grade as their grade preference. After talking with other second-grade teachers, Lucier became aware that Gorski and Ackman worked so closely to the exclusion of other second-grade teachers.

So that Gorski and Ackman would have contact with other teachers, in 1987, Lucier attempted to separate Gorski and Ackman by placing their classrooms on different floors. He did not execute this plan because of Gorski's and Ackman's vehement opposition.

However, in the fall of 1988, Lucier again spoke to Ackman about the close working relationship between her and Gorski. Lucier told Ackman that, although he highly regarded the work the two had done, he thought that it would be healthy for them to work with other teachers and to consider making a change in the future. Ackman asked whether both she and Gorski could be transferred if two positions became open in a higher grade level and Lucier responded affirmatively.

During the 1988-89 school year, there were four second-grade classes at Blackwell. Gorski and Ackman each taught a class, Debbie Zollner (Zollner), taught a third class, and a job-sharing team of Werner and Susan Walsh (Walsh) taught the remaining class. Werner and Walsh were in their first year of teaching second grade after having been transferred from other grade levels.

Several times during the 1988-89 school year, Walsh complained to Lucier that she felt excluded from second-grade matters. Because of these complaints, it appeared to Lucier that the second-grade teachers were not working in harmony. Instead, it appeared that Gorski and Ackman worked together, the job-sharing team worked with each other, and Zollner worked alone.

In approximately February 1989, Lucier discovered that it was necessary to reduce the number of second-grade classes at Blackwell from four to three and to add a first-grade class. In March, when making his tentative staffing assignment for 1989-90, Lucier decided to move Werner and Walsh to the vacant first-grade position. Werner and Walsh initially agreed.

However, Werner later told Lucier that she preferred to stay at the second-grade level. Lucier testified that, after talking with Werner, he realized that fairness dictated that Gorski or Ackman move, rather than Werner and Walsh, and that this would be best for the building. He decided in April to move Gorski, rather than Ackman, because he felt that Ackman would take the move harder.

Lucier decided that, if Gorski rejected the first-grade assignment, he would give it to third-grade teacher Gabryelewicz and place Gorski in the third grade. Gabryelewicz had expressed a desire to change grades. Gorski's grade preference form showed second grade as her first choice, fourth grade as her second choice, and fifth grade as her third choice. Lucier did not meet with Gorski as was the past practice.

Lucier testified that in making grade assignments, his intention was to do the right thing. He felt that Gorski was a superior teacher and had given her that rating on her 1988-89 performance evaluation.

He thought Gorski's strong language arts background would be particularly valuable to a third-grade class. He was aware that Gorski was an Association building representative. The record does not indicate whether Ackman participated in Association activities.

On May 2, 1989, Lucier prepared a memorandum entitled "Personnel Plan to Maintain Blackwell as a High Quality School." He directed the memorandum to several District administrators. The memorandum recommended specific personnel action regarding Gorski, Wojcik, Roemer, and Blackwell teacher Gail Riss (Riss). Lucier thought his overall recommendation would be in the best interest of the school and would improve the school climate. Concerning Gorski, the memorandum stated:

> "The team of Penny Ackman and Bev Gorski should be split up with Penny remaining in second and Bev moving on to another grade. This action would be a follow up to previous private discussion with them and would be helpful to them as individuals and to the building. Plan also seems fair in that they have been together in grade 2 for nine years while others are always forced to move because 'Penny' indicates they do not want to be split up."

Lucier met with Gorski on May 5, 1989, to inform her of her reassignment. He told her that he had decided to move her or Ackman from the second grade and that he felt she would be the best person to move. When Gorski asked why she was being reassigned, Lucier said it was for the good of the school. He offered her positions in the first or third grade.

Gorski asked Lucier if she would be considered for any future second-grade openings. Lucier answered in the negative. Gorski also told Lucier that she felt she was being punished. Lucier did not respond. Lucier had not mentioned to Gorski before the May 5, 1989, meeting that she might be assigned to another grade for 1989-90.

INVOLUNTARY TRANSFER OF KAY WOJCIK

Blackwell teacher Wojcik served on the Association negotiations and bargaining committee in 1987. She was also involved in Association activities during the 1989-90 school year.

In April 1989, Lucier evaluated Wojcik under the evaluation plan developed by the District and the Association. Only certain provisions of the evaluation plan are a part of the collective bargaining agreement and subject to the contractual grievance and arbitration process. These provisions primarily concern evaluation procedures. While the contractual provisions do not include the evaluation form itself, they

contain references to the form. The evaluation form contains an "area(s) for improvement" section and states that the evaluator is to indicate suggestions for improvement. Nothing else in the evaluation plan requires that these sections be completed.

There are four ratings under the plan: superior, excellent, satisfactory, and unsatisfactory. Lucier rated Wojcik as "excellent." Wojcik received her evaluation on approximately April 11, 1989. Lucier scheduled a conference for April 13, 1989, to discuss the evaluation with Wojcik.

Before the conference, Wojcik submitted to Lucier a letter stating:

"These are the questions that I plan to ask about my evaluation. Since I rated less than superior, I am anxious to learn ways to improve my work.

1. Is it possible for me to earn a higher rating?

2. If so, what specific things do I have to do to earn a higher rating?

3. Would you fill in the appropriate areas for improvement on my written evaluation?

4. Based on your written evaluation, I am assuming that I received a satisfactory rating on my lesson plans. Why was I not told that lesson plans were only satisfactory prior to final evaluation?

5. Did you look at my lesson plans or those of my student teacher?

6. Is my actual classroom teaching less than superior?

7. Do you feel that I do not provide leadership at my grade level?

8. Why are last year's committees and involvements excluded from my evaluation? Program Assessment (half year), Discipline, PAC (included). Also took advance curriculum design Workshop and Cooperative Learning Workshop.

9. Do you believe that I am punctual for bus duty, door duty, daily attendance, and arrive at my room before the children in the morning?

10. Do you think that I work well with colleagues?

11. Do you feel that I need to lead more/less?

12. Do you think that I have adequate discipline in my room for a superior rating?

13. Do you believe that I have to foster better behavior in my room?

14. Do you see that I lack flexibility?

15. Do you think that I should be less opinionated in a group situation? Should I speak up less?

16. Do you believe that I lack policy adherence?

17. Is my record keeping accurate enough to earn a higher rating?

18. Do you think that parent contact is adequate for superior rating?

19. In what ways do I and do I not serve as a role model for others?

20. Do you think I am not enthusiastic and supportive?"

Lucier felt disappointed and insulted by the questions.

Lucier and Wojcik met on April 13, 1989, to discuss Wojcik's evaluation. At the meeting, Wojcik repeatedly attempted to get answers to her questions, and Lucier consistently refused to answer the questions or advise her on specific improvement. Their major dispute was whether Lucier was required to fill in the "area(s) for improvement" section of the evaluation form.

Wojcik also asked Lucier why he had not rated her as a superior teacher. Lucier initially refused to respond. However, he later stated two examples of why Wojcik did not receive a superior rating.

At the end of the meeting, Wojcik stood up and abruptly said that she had to leave, that she could no longer work with Lucier, and that she might consider getting a transfer to another school.

On the morning of April 14, 1989, a group of teachers, including Wojcik, stood in the main office discussing the Illinois State lottery and their plans if they won the standing jackpot. One teacher said he or she would quit, another said that he or she did not know what he or she would do, and Wojcik said that she would not quit her job but would stay and harass Lucier. Laughter surrounded all of these comments, and the atmosphere was light. However, Blackwell secretary Lonna Schwerin reported Wojcik's comment to Lucier because she considered Wojcik's statement to be unprofessional.

Prior to the April 13, 1989, evaluation conference, Wojcik complained to Association president Eliasek that Lucier had not completed the "area(s) for improvement" section of her evaluation. After the evaluation conference, Wojcik again raised this concern to Eliasek, and also described the conference to him. Eliasek contacted Lucier and assistant superintendent Barbini. On April 24, 1989, Eliasek met with Lucier. During their conversation, they discussed Lucier's failure to fill in the "area(s) for improvement" sections on evaluation forms.

On the evening of April 24, 1989, Lucier prepared a memorandum entitled "Chronology of Events Related to the Evaluation of Kay Wojcik." The memorandum stated in part:

"Special note: It is principal's opinion that the actions taken by Mrs. Wojcik:

1. Showed disrespect to Dr. Lucier as the building principal.

2. Were detrimental to the morale of Blackwell School which the principal and staff have worked hard to develop.

3. Were unprofessional in nature and anything but the model behavior called for in many of the superior rating categories.

Dr. Lucier's request would be for the District to assign Mrs. Wojcik to another building site for the 1989-90 school year at the request of the Blackwell principal. (Mrs. Wojcik has stated her desire for a transfer and on her preference sheet a junior high position.) Should that not be possible, building administrator would like advice and direction from central office on the best way to officially record this incident. Principal is concerned about future negative effects on building morale given Mrs. Wojcik's feelings regarding the building principal.

What kind of support on other issues can Dr. Lucier expect from a teacher who went through all of the above in response to being called an excellent teacher by her principal?"

According to Lucier, the conduct to which he referred was Wojcik's 20 questions, her actions at the conference, and her comment about the lottery. Lucier testified that he wanted to give Wojcik the opportunity to be evaluated by another principal, since her conduct at the evaluation would affect his next evaluation of her. At the time Lucier drafted the memorandum, he had not discussed his recommendation with Wojcik.

Lucier's May 2, 1989, memorandum entitled "Personnel Plan to Maintain Blackwell as a High Quality School" discussed Wojcik as follows:

"Kay Wojcik should be assigned to another school in District 54. Write up should be included in her file, but should center on her desire to be considered a superior teacher and the fact that at Blackwell that no longer seems possible. Focus should be that working under a new principal would give her an opportunity to get a fresh start in her efforts to gain the top rating. Kay's challenge would be to prove that it was simply a misunderstanding between principal and teacher as well as going through the new evaluation process for the first time."

Lucier's recommendation was approved at his May 2, 1989, meeting with District administrators.

On May 24, 1989, a District personnel administrator informed Wojcik that the District had decided to transfer her to a different school. The District's decision was based on information Lucier provided. The personnel administrator did not speak to Wojcik before May 24, 1989.

LUCIER'S LETTER ON THE TEACHING PERFORMANCE OF MARY BETH ROEMER

In late March or early April 1989, Roemer sent a final warning of a student's suspension from the school lunch program to the student's mother, together with an explanatory note. When the student's mother later approached Lucier, Lucier told the student's mother that he would have Roemer telephone her.

On April 26, 1989, Lucier suggested that Roemer call the student's mother. Roemer replied that she had sent the note and that the student's mother had not tried to contact her. Roemer also stated that it was not necessary for her to be involved, since it was a lunchtime problem. Lucier, however, again suggested that Roemer call the student's mother. He did not tell Roemer that what she said was unprofessional or otherwise unacceptable. The record does not indicate that Roemer made the telephone call which Lucier had suggested.

Also on April 26, 1989, approximately 15 sixth graders approached Lucier and complained about what they considered unjustified group punishment. The students were not from Roemer's class. On April 27, 1989, Lucier called a meeting of the three sixth-grade teachers, including Roemer, to discuss student discipline. At the meeting, Roemer told Lucier that it "took a lot of guts for those students to corner you like that and surround you and talk to you about this." Lucier responded that he would rather deal with a group of students than with hostile parents. Lucier's impression was that Roemer challenged his right to listen to students or parents without first consulting the teacher. Lucier did not otherwise criticize Roemer's comment during the meeting.

During this same period, assistant principal Joan Gazdic (Gazdic) complained to Lucier about Roemer's attitude toward the clinical supervision process. In late April or early May, Gazdic sent out the remaining notices of the third round of clinical supervision conferences. During that time period, when Gazdic was in the teachers' lounge, Ackman asked Gazdic whether there would be a third observation or whether she had received a notice by mistake. Gazdic responded that she would conduct a third observation of all teachers.

Shortly thereafter, Roemer entered the lounge. Ackman said to Roemer something such as, "Good news, Mary Beth, we do get evaluated a third time." Roemer's response was something such as "Oh goody" or "Oh great." Roemer, Ackman, and Gazdic all laughed. During the conversation either Roemer or Ackman asked Gazdic why she was conducting a third observation when only two were required. Gazdic explained that she and Lucier had agreed that there would be three observations, if possible.

Gazdic felt embarrassed because other teachers in the lounge could hear the exchange. However, she did not complain to Roemer or Ackman about their conduct.

Afterwards, Gazdic reported the incident to Lucier, since she felt challenged and felt it was necessary to inform him that teachers were questioning the need for a third observation. To Lucier, Gazdic seemed more concerned with Roemer than with Ackman, since Gazdic had previously told him that Roemer had a lax attitude about the clinical observation process and that she had encountered difficulty in scheduling Roemer's second observation.

As part of his May 2, 1989, memorandum to District administrators, Lucier recommended that Roemer be written up or transferred. The record does not show what the administrators decided or said. On May 5, 1989, Lucier wrote Roemer a letter about her teaching performance. The letter stated:

"Sometimes a point of view or behavior can creep into a teacher's performance without the individual even being aware of it. Hopefully that is the case regarding a pattern that I have observed with Mary Beth Roemer.

Specifically, a questioning attitude has been gradually replacing the positive outlook I associated with Miss Roemer when she was a grade 1 teacher a few years back.

In relation to the principal or assistant principal, she will be heard to say ... what right does that parent have to see you, what right do those students have to stop and talk to you, what right does the Blackwell administration have to conduct a *third* clinical supervision round?

This questioning attitude creates the feeling that the parents or the administration is the opposition rather than the people with whom we work openly on behalf of the students.

During the upcoming 1989-90 school year I feel it is most important for Mary Beth to work toward a more positive, supportive attitude in her relationships with administration, staff, CST, and parents.

My concern relative to the District 54 Teacher Evaluation Plan centers on professionalism and in particular staff communications. Review of the matrix in this area could be very helpful. Miss Roemer has much to offer the field of education and Blackwell School, but the items described above are standing in the way. I would be happy to work together to get them corrected." (Emphasis in original.)

Lucier took no similar action against Ackman. He testified that his concern with Ackman was minor compared to his concern with Roemer, because of the situations which occurred regarding Roemer.

On May 5, 1989, Lucier met with Roemer to discuss the letter. At the meeting, Roemer asked Lucier for more specific information about criticism made of her. Lucier gave her two examples which involved the Principal's Advisory Council and the District Child Study Team. Before the meeting, Lucier did not discuss with Roemer any of the incidents which led to the letter.

Lucier's May 5, 1989, letter was copied to Roemer's personnel file. Lucier stated at the meeting that, if he believed she had shown improvement in the 1989-90 school year, the letter would be removed from her file at the end of the year and would not become a part of her formal evaluation. When the hearing in this case took place February 6, 7, and 9, 1990, the May 5, 1989, letter was still in Roemer's file.

ADMINISTRATIVE PROCEEDINGS

The Association filed an unfair labor practice charge against the District alleging that the District had violated the Act by observing the April 25 Association meeting, by transferring Wojcik to another school, by transferring Gorski to another classroom, and by issuing the letter to Roemer.

The hearing officer decided that (1) the District did not violate section 14(a)(1) of the Act when Lucier observed the April 25, 1989, Association meeting since he did not engage in unlawful surveillance (this finding is not a part of this appeal), (2) the District did not violate sections 14(a)(3) and 14(a)(1) of the Act by reassigning Gorski since the District acted for reasons other than Gorski's protected concerted activities, and (3) Wojcik and Roemer engaged in protected and unprotected activities but Lucier did not recommend Wojcik's transfer or write the letter to Roemer because of their protected activities.

The Association filed exceptions to the order, contending (1) that the District engaged in unlawful surveillance, (2) that the District violated sections 14(a)(3) and 14(a)(1) of the Act by reassigning Gorski,

(3) that the District was unlawfully motivated and that its asserted legitimate reasons did not withstand scrutiny, (4) that the transfer of Wojcik and the letter to Roemer violated sections 14(a)(3) and 14(a)(1), (5) that all of Wojcik's actions were protected, (6) that there was evidence of the District's unlawful motivation and the District's asserted legitimate reasons were pretextual, and (7) that Roemer's activity at issue was protected and, therefore, the District's actions were unlawfully motivated.

The District responded that it did not engage in unlawful surveillance and that there was no link between Gorski's protected activities and her reassignment, and that the District instead acted for legitimate reasons. The District argued that the hearing officer correctly concluded that certain of Wojcik's behavior was unprotected. The District also argued that there was no causal connection between Wojcik's protected activities and her transfer. Finally, the District contended that Lucier's letter to Roemer resulted from activities that were not protected under the Act.

The Board, in affirming in part and reversing in part, found (1) that the District violated sections 14(a)(1) and 14(a)(3) of the Act by reassigning Gorski to another grade, (2) that the District violated section 14(a)(1) of the Act by transferring Wojcik to another school and by issuing Roemer a letter on her teaching performance, (3) that the District did not violate section 14(a)(3) of the Act by transferring Wojcik or by issuing the letter to Roemer, and (4) that the District did not violate section 14(a)(1) by engaging in unlawful surveillance.

The Board ordered the District to (1) cease and desist from (a) interfering, restraining, or coercing employees in the exercise of rights guaranteed under the Act, (b) discriminating in regard to hire or tenure of employment or any term of employment to discourage membership in the Association, (2) take the following affirmative action to effectuate the policies of the Act: (a) assign Gorski to teach a second-grade class at Blackwell, (b) reinstate Wojcik in her position at Blackwell, (c) remove from Roemer's personnel file principal Lucier's May 5 letter regarding her teaching performance, (d) make whole the three teachers, (e) post on bulletin boards in all District buildings copies of an appropriate notice to employees for 60 days, and (f) notify the executive director in writing within 35 calendar days after receipt of opinion and order of the steps taken to comply with said order.

One Board member concurred in part and dissented in part. While agreeing that the Association established a *prima facie* case of a section 14(a)(3) violation, he concluded that the District rebutted that *prima facie* case by establishing legitimate reasons for Gorski's reas-

signment: Lucier was concerned with the closeness with which Gorski and Ackman worked, Lucier considered that it was fair to require Gorski or Ackman rather than the job-sharing team to move to another grade level, other teachers repeatedly complained to Lucier on the topic, Lucier attempted to separate Gorski and Ackman in 1987 and spoke to Ackman in the fall of 1988 about her and Gorski working with other teachers, and Lucier's concerns predated the concerted activities in issue. According to the Board member, the aforementioned reasons suggested that the District would have reassigned Gorski even if she had not engaged in protected union activity. Moreover, according to this Board member, Lucier wanted to be fair. Gorski and Ackman had taught the second grade much longer than other second-grade teachers. The Board member also disagreed with the majority's reliance on the timing of Lucier's actions.

This appeal followed.

OPINION

Section 3(a) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 1703(a)) provides:

"It shall be lawful for educational employees to organize, form, join, or assist in employee organizations or engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or bargain collectively through representatives of their own free choice and, except as provided in Section 11, such employees shall also have the right to refrain from any or all such activities."

Sections 14(a)(1) and 14(a)(3) (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(3)) of the Act provide:

"(a) Educational employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.

\*\*\*

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization."

I

■ As with other administrative review cases, the findings and conclusions of the Board on questions of fact are considered *prima facie* true and correct. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391, 469 N.E.2d 1085.) Courts may not interfere with the discretionary au-

thority vested in an administrative agency unless that authority is exercised in an arbitrary or capricious manner or the administrative decision is against the manifest weight of the evidence. *Murdy*, 103 Ill. 2d at 391; *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 906, 493 N.E.2d 1130.

A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in the light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision. *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1094, 492 N.E.2d 929.

Reviewing courts may not reweigh the evidence or substitute their judgment for that of the agency. Their sole function is to ascertain whether the findings of the administrative agency are contrary to the manifest weight of the evidence. *Murdy*, 103 Ill. 2d at 391; *Board of Education of Plainfield*, 143 Ill. App. 3d at 906.

However, courts of review are not bound by an agency's interpretations of law. (*Board of Education of Plainfield*, 143 Ill. App. 3d at 907.) Reviewing courts may find an agency's findings to be contrary to the manifest weight of the evidence only when, in examining the record, the reviewing court finds that an opposite conclusion is clearly evident. *King v. City of Chicago* (1978), 60 Ill. App. 3d 504, 509, 377 N.E.2d 102.

Further, reviewing courts are not bound to give the same deference to an administrative agency's conclusions of law and statutory construction as would be given factual findings, on which a reviewing court must exercise independent review and judgment. *Illinois Bell Telephone Co. v. Human Rights Comm'n* (1989), 190 Ill. App. 3d 1036, 1046, 547 N.E.2d 499.

For reasons hereinafter stated, we hold that the Board's determination that the District committed unfair labor practices was against the manifest weight of the evidence.

## II

The District contends that the Board's ruling that the District took adverse action against teachers Wojcik and Roemer because they had engaged in activity protected by section 3(a) of the Act is based on an overbroad and erroneous interpretation of the Act and is contrary to the manifest weight of the evidence.

The Board agreed with the hearing officer that there was no link between protected union activity and the actions taken by the District with respect to Roemer and Wojcik. Accordingly, it concluded that

there were no violations of section 14(a)(3) with respect to either teacher. However, the Board reversed the hearing officer and held that the District had violated section 14(a)(1) of the Act.

Section 14(a)(1) prohibits employers from "[i]nterfering, restraining or coercing employees in the exercise of rights guaranteed under" the Act. (Ill. Rev. Stat. 1989, ch. 48, par. 1714(a)(1).) One of the rights guaranteed under section 3 is the right to engage in "lawful concerted activities for the purpose of *** mutual aid and protection." (Ill. Rev. Stat. 1989, ch. 48, par. 1703(a).) The Board concluded that both Roemer and Wojcik had engaged in concerted activities within the meaning of section 3 of the Act and that the District's actions with respect to them interfered with those activities.

■ The Board's conclusion is based on an unsuitable definition of the meaning of the word "concerted" in section 3 of the Act. The Board stated:

> "[W]e shall presume, in the absence of contrary evidence, that a 'concern, gripe or complaint about wages, hours, terms and conditions of employment' is concerted if it is based on a group concern."

This interpretation of the Act is contrary to statutory language and the Act's purpose of promoting "orderly and constructive relationships between all educational employees and their employers" (Ill. Rev. Stat. 1989, ch. 48, par. 1701), because it makes the exercise of supervisory authority impossible. *We reject this interpretation.*

The Illinois Supreme Court has recognized that the State's two labor relations acts are modeled after the National Labor Relations Act and that National Labor Relations Act (NLRA) precedent, while not binding on Illinois agencies or courts, is highly instructive and should be carefully examined except where the General Assembly modified NLRA language. *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345, 538 N.E.2d 1146.

The Act language at issue in this case, "concerted activities for the purpose of *** mutual aid and protection," is identical to the language of section 7 of the National Labor Relations Act. The definition of that statutory language adopted by the Board in this case is one which was adopted by the National Labor Relations Board in *Alleluia Cushion Co.* (1975), 221 N.L.R.B. 999, and rejected by it nine years later in *Meyers Industries, Inc.* (1984), 268 N.L.R.B. 493, 497 (*Meyers I*) *remanded sub nom. Prill v. National Labor Relations Board* (1985), 755 F.2d 941, *cert. denied* (1985), 474 U.S. 971, 88 L. Ed. 2d 320, 106 S. Ct. 352, *on remand Meyers Industries, Inc. v. National Labor Relations Board* (1986), 281 N.L.R.B. 882 (*Meyers II*) *aff'd*

*Prill v. National Labor Relations Board* (1987), 835 F.2d 1481, 1482-83, *cert. denied* (1988), 487 U.S. 1205, 101 L. Ed. 2d 884, 108 S. Ct. 2847.

In interpreting the protection conferred by section 7 of the National Labor Relations Act, the National Labor Relations Board and the Federal courts have concluded that employees engage in "concerted" activity where they invoke a right grounded upon a collective bargaining agreement or the activity is engaged in "with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Meyers I*, 268 N.L.R.B. at 497.

> "Concerted activities are protected so that employees may share in the determination of their terms and conditions of their employment. *** Concerted activities, to be protected, must be a means to an end, not an end in themselves." *National Labor Relations Board v. Marsden* (1983), 701 F.2d 238, 242.

*Pelton Casteel, Inc. v. National Labor Relations Board* (1980), 627 F.2d 23, 28 ("[T]he employee's actions themselves [must] at least contemplate some group activity. *** [P]ublic venting of a personal grievance, even a grievance shared by others, is not a concerted activity"); *Indiana Gear Works v. National Labor Relations Board* (1967), 371 F.2d 273, 276 (Activity must be for the "purpose of inducing or preparing for group action to correct a grievance or complaint").

The Board's conclusion that activity is protected whenever it involves a "group concern" eliminates from section 3 the requirement that the activity be concerted.

> " 'Concerted activity' is an essential predicate, in effect a jurisdictional requirement, for Board action *** in a case such as this. The burden of establishing by proof such essential predicate to quasi jurisdiction rests on the Board. It would be odd, indeed, if this essential quasi jurisdictional predicate might be supplied by a presumption admittedly resting on no factual base but predicated on a purely theoretical assumption." *Krispy Kreme Doughnut Corp. v. National Labor Relations Board* (1980), 635 F.2d 304, 310.

The rationale offered by the Board for its expansive view of its jurisdiction is:

> "Under the standard of *Meyers Industries*, the early stages of organization, when individual employees are beginning to become active, may not be protected."

This concern is unfounded. By its own terms, section 3 of the Act protects the right of employees to "organize, form, join, or assist in

employee organizations." (Section 3 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1703).) This statutory language is intended to and does protect the activities of individual employees at all stages of organization. As the National Labor Relations Board explained in *Meyers II*, its standard "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Meyers II*, 281 N.L.R.B. at 887.

The Board's overbroad interpretation of section 3 is thus unnecessary to effectuate the legitimate goals of the Act. Moreover, it undermines the policy of promoting harmonious labor relations by quelling legitimate exercises of supervisory authority.

WOJCIK

The Board found that Wojcik engaged in protected activity based on her conduct in the evaluation conference with Lucier. It found that her desire to have Lucier complete the areas of improvement section of the evaluation was a "group concern" because section 24A—5(d) of the School Code (Ill. Rev. Stat. 1989, ch. 122, par. 24A—5(d)) requires "specification as to the teacher's strengths and weaknesses, with supporting reasons for the comments made." It also found the fact that other teachers discussed the issue with Gorski to be evidence of a group concern.

■ As discussed above, a jurisdictional prerequisite to the finding that activity is protected is that it be concerted. The record is void of any conclusion that Wojcik's activity was anything but personal in nature. At the hearing, she specifically disclaimed having attempted to enlist the support of other employees on the evaluation issue, stating:

"I didn't speak at the meeting because I didn't want to appear to be a leader in any way. I wasn't a leader, and I didn't want to have to say anything at those meetings."

The hearing officer correctly found:

"Wojcik's insistence that Lucier answer the 20 questions that she had prepared prior to the interview, and her persistent attempt to get Lucier to tell her the specific areas in which she needed improvement, represent the assertion of an individual concern for which she sought personal suggestions and responses tailored to her individual situation. It is clear from the evidence that Wojcik's overriding purpose at the evaluation conference was to find out why she had not been given a 'superior' rating and to learn what she needed to do to achieve such a

rating. Since Wojcik pursued her own interests in dealing with Lucier regarding her evaluation, she clearly cannot be said to have acted with or on the authority of other District teachers. Therefore, Wojcik's activity in this regard was not concerted."

The Board's conclusion that Wojcik's conduct was protected because she was articulating a "group concern" distorts the Act by protecting purely selfish behavior.

In *National Labor Relations Board v. City Disposal Systems, Inc.* (1984), 465 U.S. 822, 79 L. Ed. 2d 839, 104 S. Ct. 1505, the United States Supreme Court concluded that the National Labor Relations Act protects individual employees who invoke contractual rights because their activity is a direct extension of the collective bargaining process. The Board offers as an alternative rationale for its decision the notion that Wojcik was invoking a right based on the collective bargaining agreement. This subverts the rationale of *City Disposal Systems*.

The right to challenge the content of evaluations was excluded from the collective bargaining agreement. The essence of collective bargaining is that employee representatives have the exclusive right to negotiate terms and conditions of employment. Ill. Rev. Stat. 1989, ch. 48, par. 1703(b).

Individual employees do not have the right to insist on terms and conditions in addition to or different from what has been negotiated by their exclusive representative. The Act does not protect employees who demand "rights" which are excluded from the collective bargaining agreement. Contrary to the situation in *City Disposal Systems*, protecting employees whose demands are different than what their union negotiators agreed to is not a natural extension of concerted action; it is a repudiation of the union's right to be the exclusive negotiator with the employer and wholly undermines the collective bargaining process.

Wojcik's behavior was nothing more than a personal gripe. It neither contemplated nor promoted group action. She was disappointed because she was rated "excellent" rather than "superior." Her disappointment led her to argue with Lucier in the evaluation conference, to walk out of that conference saying that she might need to transfer schools, and to publicly state that if she won the State lottery she would stay around to harass the principal.

Her conduct was rude and unprofessional. The District's response of giving her the opportunity to go to another school to work with a principal whom she had not alienated was a reasonable response to her conduct. The Board's finding that Wojcik's conduct was protected

by the Act is tantamount to declaring that that Act has liberated teachers from meeting minimal standards of professional conduct with respect to principals. We reverse the Board's holding because it is contrary to the language and purposes of the Act.

ROEMER

The Board found that the District "issued the letter on Roemer's teaching performance because of her nonunion protected concerted activity." It decided that Roemer had engaged in protected concerted activity on two occasions: first, by her comments at the meeting of sixth-grade teachers, and second, when she participated in the conversation with Gazdic and Ackman about the necessity for a third clinical observation.

The Board found that Roemer's comments at the meeting of sixth-grade teachers involved a group concern because she questioned Lucier's decision to talk directly to students who were in another teacher's class. However, this conclusion reads out of section 3 the requirements that activity be concerted and that it be for mutual aid and protection.

█ Roemer's comments were not concerted. They were based on her personal feelings. No evidence demonstrates that the teacher (Jennifer Erck) whose students complained to Lucier shared Roemer's notions about a "chain of command" with respect to student complaints.

Second, Roemer assuredly was not speaking in order to aid and protect Erck. Quite the contrary. She voiced her disapproval to Lucier in part because she did not think she should have to attend a meeting when it was Erck's students who were complaining and she told Lucier he should talk to Erck about the problem. Moreover, Erck had previously complained to Lucier that she felt frustrated and excluded in sixth grade because Wojcik and Roemer worked as a team.

Roemer's comments at the sixth-grade meeting were examples of an employee voicing a personal pique. The Board's finding that her remarks were within the protection of the statute is manifestly erroneous.

The Board's finding that Roemer and Ackman's conversation with Gazdic was concerted is also incorrect. The conversation ("Good news, Mary Beth. *** We get evaluated a third time," "Oh goody, Oh great"), was simply an exercise in sarcasm by the two employees. It was not intended to bring a serious concern to Gazdic's attention nor was it preparatory to group action of any type. The mere fact that two employees engage in unprotected activity does not make that ac-

tivity protected. *National Labor Relations Board v. Marsden*, 701 F.2d at 242-43 (workers who walked off job together were unprotected when no demand was presented to their employer); *Indiana Gear Works*, 371 F.2d at 277 (employee lawfully discharged for posting cartoons which ridiculed a recent wage increase even though two other employees helped him and other employees shared the concern about the wage increase).

Even were we to conclude that Roemer and Ackman's conversation was protected because two employees were involved, the record clearly demonstrates that Lucier would have sent the letter to Roemer even without the conversation with Gazdic. Roemer's refusal to call a parent at Lucier's request and attack on him at the sixth-grade meeting on April 26, 1989, were fully significant triggers for the letter.

The evidence in this case shows that Roemer became less than co-operative during the month of April. There is no evidence that her behavior was intended to lead to any group action or that she was acting on behalf of anyone except herself.

The purpose of the Act was not to purge supervisory authority or protect insubordination. Roemer's behavior fell outside the protection granted by the Act to lawful, concerted activity for mutual aid and protection. Her conduct was at odds with the Act's goal of promoting orderly and harmonious labor relations and the Board erred by finding her conduct to be protected.

### III

The District contends that the Board's ruling that the District reassigned teacher Gorski because she engaged in union activities is based on a misapplication of the burden of proof and is contrary to the manifest weight of the evidence and the law. We agree.

Over the dissent in part and concurrence in part of Chairman Gerald Berendt, the two-member Board majority reversed the hearing officer and ruled that teacher Gorski was transferred from second to third grade because of her union activities. Contrary to the District's belief, this is a dual or mixed motive case:

> "[W]here the employer advances legitimate reasons for the [adverse employment action] and is found to have relied upon them in part, then the case is characterized as one of 'dual motive' and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement." *City of Burbank*, 128 Ill. 2d at 346-47.

In order to establish that adverse action was taken against Gorski because of protected conduct, the Association had to prove:

"(1) the employee engaged in activity protected by section 14(a)(3) of the Act; (2) the District was aware of that activity; and (3) the employee was discharged for engaging in that activity." *Hardin County Educational Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 178-79, 528 N.E.2d 737.

■ A mixed motive case is one where the employee's evidence does more than create a permissible inference of discrimination; it establishes a clear nexus between the protected activity and the employer's action by a preponderance of the evidence. (*City of Burbank*, 128 Ill. 2d at 345.) Where the plaintiff has established that causal link, the employer can still escape liability if it can prove by a preponderance of the evidence that it would have taken the same action regardless of the protected activity. In such cases, the burden of proof shifts to the employer. *National Labor Relations Board v. Transportation Management Corp.* (1983), 462 U.S. 393, 403, 76 L. Ed. 2d 667, 676, 103 S. Ct. 2469, 2475.

Here, the Board majority concluded that Gorski had established a *prima facie* case of discriminatory reassignment for six reasons: (1) the coincidence in timing between Gorski's protected activities and Lucier's recommendation that she be reassigned; (2) the fact that Lucier changed his mind about Gorski's original assignment; (3) the fact that Lucier chose to reassign Gorski rather than Ackman; (4) a supposed departure from past practice in the way the transfer was handled; (5) the "vague" explanation given by Lucier to Gorski concerning the action; and (6) the fact that Gorski's union activities were extensive. Based on this analysis, the Board stated:

"Since the Association has established a *prima facie* case, the burden shifts to the District to demonstrate, by a preponderance of the evidence, that it would have reassigned Gorski in the absence of her protected activity."

However, the Association failed to establish a causal link between Gorski's activity and her reassignment. Lucier was aware that Gorski had been a union building representative since 1986. The record negates any inference that he had animus toward her union activities. Lucier gave Gorski the top rating on the one evaluation he performed of her teaching. He accommodated her desire to stay in second grade for a number of years with Ackman even though other teachers had to change grades more frequently. These teachers complained that they felt excluded by the Gorski/Ackman team. Lucier's lack of anti-

union animus is further demonstrated by the fact that he and the District took no adverse action against Wojcik when she served on the Association's negotiations and bargaining committee.

There is no evidence that Lucier took umbrage to Gorski's role in holding a building meeting concerning his evaluations or at the survey which she and Gabryelewicz conducted. To the contrary, Association president Eliasek characterized Lucier as amicable when he met with him about the evaluation process. Gorski's testimony suggests that Lucier was equally courteous when she and Gabryelewicz presented the results of their survey to him.

The Board principally relies on the coincidence in timing as the causal link between Gorski's activities in connection with Lucier's evaluations and the decision to reassign her. However, timing alone is not evidence of a discriminatory motive on the part of the employer. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board* (1988), 175 Ill. App. 3d 191, 200, 529 N.E.2d 773; *Hardin*, 174 Ill. App. 3d at 185.

In this case, timing is even less probative than usual. Schools run on nine-month years and many events occur in the spring, including teacher evaluations and assignments for the following year. Gorski's activities with respect to evaluations necessarily coincided with Lucier's decisions about grade level assignments for the following year. More significantly, however, as Chairman Berendt pointed out in dissent in part and concurrence in part, Lucier's decision to reassign Gorski corresponded with his conversation with Werner.

The second reason offered by the Board majority for its conclusion that the Association had proved connection between Gorski's transfer and her protected activities was the fact that Lucier changed his mind about Gorski's original assignment. Again, however, the majority overlooked the uncontested evidence that an April 5, 1989, newsletter expressly stated that assignments were not yet final and invited teachers to approach Lucier with concerns about their assignments. Lucier's concerns about the Gorski/Ackman team were longstanding and the April 5, 1989, newsletter, which predated any protected activity, clearly contemplated the possibility of changes in grade level assignments in response to teachers' concerns. The evidence of Werner's protests to Lucier about her proposed reassignment is direct, uncontested evidence that Lucier's change of mind was not linked to Gorski's activities.

Further, in the absence of any evidence about Ackman's lack of union activities, the majority wholly discounted Lucier's testimony that he thought Ackman would take the move harder than Gorski. Yet

Lucier's testimony is fully supported by his undisputed account of Ackman's negative reaction several years before when he attempted to relocate her classroom. The fact that Ackman vehemently resisted moving her classroom to a different floor fully supports Lucier's conclusion that she would take a change in grade level harder than Gorski.

Thus, the Board's notion that Lucier departed from past practice in reassigning Gorski is totally unfounded. There was testimony that, in the past, the principal discussed potential moves with affected teachers before making his decision. Here, Lucier followed past practice by discussing the move with Werner and Walsh, the teachers he originally selected. They initially reluctantly agreed to the move, but, in April, Werner persuaded Lucier to change his mind.

The Board also criticized Lucier's explanation of this decision to Gorski as vague and cited it as additional evidence of a discriminatory motive. This is contrary to the record. Both Lucier and Gorski testified that he had explained at least some of his rationale for moving Gorski to her. Moreover, Lucier had an on-going concern with the morale of Blackwell and the tendency of the staff to divide into hostile camps. He was faced with a delicate problem when he spoke to Gorski. The reasons for his decision to move her were the complaints of other staff about the way she and Ackman interacted, and the protests of Walsh and Werner that it would not be fair to move them again. A full explanation by Lucier to Gorski of those reasons would not have been conducive to building staff unity and morale.

The District met its burden of establishing that Gorski would have been reassigned even if she had not engaged in union activity, as Chairman Berendt argued in his dissent in part and concurrence in part. The unrebutted evidence showed that Lucier had a long-standing concern about Gorski's working relationship with Ackman, that other teachers had complained about feeling excluded, and that he had approached Ackman at the beginning of the year to discuss a change.

The April complaint from Walsh that it was unfair to move her and Werner was the catalyst for Lucier's decision. The facts indicate that Lucier would have reassigned Gorski after Walsh's complaint without regard to her union activity. For the foregoing reasons, we hold that the Board's finding that the District violated sections 14(a)(1) and 14(a)(3) of the Act in reassigning Gorski was contrary to the manifest weight of the evidence.

Because we hold that the Board's findings that the District violated sections 14(a)(1) and 14(a)(3) of the Act are against the manifest

weight of the evidence, it is unnecessary to decide whether the remedy ordered by the Board is excessive and overbroad.

The order of the Board is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

MURRAY and McNULTY, JJ., concur.