673 N.E.2d 1084 (1996)
285 Ill. App.3d 507
220 Ill.Dec. 663
GENERAL SERVICE EMPLOYEES UNION, LOCAL 73, SEIU, AFL-CIO, CLC, Petitioner-Appellant,
v.
ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD; Board of Trustees of the University of Illinois, Respondents-Appellees.
No. 1-95-0729.
Appellate Court of Illinois, First District, Second Division.
November 26, 1996.
*1086 Katz, Friedman, Schur & Eagle (Irving M. Friedman, Denise S. Poloyac, of counsel), Chicago, for Appellant.
NEA, Illinois Education Ass'n (Mitchell Roth, Sandra J. Holman, Wanda Van Pelt, of counsel), Springfield, Winston & Strawn (Gregory J. Malovance, of counsel), Chicago, Amicus Curiae for Illinois Education Ass'n.
James E. Ryan (Barbara A. Preiner, Solicitor General, Karen J. Dimond, Assistant Attorney General, of counsel), Chicago, for Appellee Illinois Educational Labor Relations Board.
Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C. (Andrea R. Waintroob, of counsel), Chicago, for Appellee Board of Trustees of The University of Illinois.
Justice BURKE delivered the opinion of the court:
Petitioner General Service Employees Union, Local 73, SEIU, AFL-CIO, CLC (Union) appeals from an order of the Illinois Educational Labor Relations Board (IELRB) affirming an administrative law judge's (ALJ) determination that the University of Illinois (University) did not violate section 14(a)(1) of the Illinois Educational Labor Relations Act (the Act) (115 ILCS 5/14(a)(1) (West 1993)) in discharging a University employee. On appeal, the Union argues: (1) the IELRB improperly held that the Union was required to prove anti-union motivation on the part of the University to establish a violation of section 14(a)(1); (2) the IELRB's opinion and order was irrational, arbitrary and incorrect as a matter of law; (3) the IELRB erred in holding that an employer's *1087 unlawful motive must be proven to establish an independent violation of section 14(a)(1) of the Act; (4) the IELRB "applied the incorrect test in this case even under the standard which it articulated" because the Union "was unable to present a case under section 14(a)(3) of the Act"; (5) a violation of section 14(a)(1) of the Act should be found when the proper test is applied; and (6) the IELRB's opinion and order were against the manifest weight of the evidence. For the reasons set forth below, we reverse.
Walter Duval (Duval), a medical records technician in the medical records department at the University, began working for the University in October 1988. In 1993, while on vacation, Duval sent a postcard to his coworkers which made an alleged derogatory reference to his supervisor, Adler Voltair. When Duval returned from his vacation, he was suspended as a result of the remark he made in the postcard. The Union subsequently initiated a postcard mail-in campaign in behalf of Duval to protest the University's suspension of him. A little over a month after returning from his suspension, Duval was on lunch break when Voltair allegedly attempted to run him over or hit him with his car. Duval subsequently filed a police report to that effect with Officer Barrera, a University police officer who investigated the matter, but later retracted the charge against Voltair.
In his report, Duval claimed that Voltair drove past him, made a U-turn, and proceeded to drive by him at a fast rate of speed. Kathryn O'Flynn, director of medical record services at the University and Voltair's supervisor, learned of Duval's police report and was aware of the postcard campaign. O'Flynn later said she did not have a reaction to the postcard campaign. According to Union representative Marsha Robinson, however, O'Flynn told her in a telephone conversation as follows:
"[Duval] had falsified a police report and she wanted him out of there; that he had to go; that she was fed up. And that this blue piece of paper [Union contract campaign update] that was going around talking about send [sic] postcards, how could we uphold someone like that. It was just ridiculous. She wanted him out of there. She wanted him discharged. He had to go."
O'Flynn further stated at that time:
"He has got to go. I want him out of here. I talked with Personnel and we are going to discharge him. He is out of here. These postcards are just ridiculous. We don't have to tolerate this and we are not going to take it anymore. I want him out. Out. It is just ridiculous that you are all upholding him with these postcards."
Shortly after Duval retracted his statement to Officer Barrera, the University discharged Duval based on his "falsification of a police report." The Union subsequently filed an unfair labor practice charge against the University in behalf of Duval, alleging that he was discharged by the University "in retaliation for concerted, protective activity, engaged in by co-workers" in behalf of Duval (the postcard campaign) in violation of section 14(a)(1) and 14(a)(3) of the Act, which provides:
(a) Educational employers, their agents or representative are prohibited from:
(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.
* * * * * *
(3) Discriminating in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any employee organization.
The IELRB, however, issued a complaint alleging only that the University violated section 14(a)(1) of the Act based on the IELRB's director's decision that the Union had not presented enough evidence to support a section 14(a)(3) violation.
At the hearing on the Union's complaint on January 25, 1994, the ALJ initially stated that the Union had alleged a violation of section 14(a)(1) and 14(a)(3) of the Act but that the IELRB's executive director had issued a complaint which only included a section 14(a)(1) claim. The ALJ further stated he was aware that the Union was not pleased with the executive director's exclusion of the 14(a)(3) claim, but that the Union was nonetheless *1088 withdrawing its section 14(a)(3) claim to prevent any delay in the proceeding.
Thereafter, on June 24, 1994, the ALJ issued his Recommended Decision and Order, which addressed the following issues:
"A. Should this matter be referred to the parties' contractual grievance arbitration procedure?
B. Did UIC violate Section 14(a)(1) of the Act by discharging Walter Duval?"
The ALJ held that the referral of the case to arbitration was inappropriate,[1] and that the University did not violate section 14(a)(1) of the Act.
In determining that the University did not violate section 14(a)(1) of the Act, the ALJ reviewed the findings of fact, and determined that officer Barrera's testimony was more credible than Duval's regarding where Duval was positioned at the time of the alleged auto incident. The ALJ also stated that it was undisputed Duval wrote the following portion of his statement withdrawing the complaint against Voltair on his own:
"`Mr. Barrera explained to me that if Mr. Voltaire's [sic] car crossed the yellow lines then it would have been considered a violation. Since the vehicle did not cross the line I withdraw all charges. The vehicle did not strike me or attempt to hit me.'"
The ALJ concluded "[t]hat Adler Voltaire [sic] did not use his vehicle to attempt either to strike or scare Walter Duval on July 19, 1993." The ALJ based this decision on Duval's written statement and his lack of credibility. Additionally, the ALJ noted that neither of Duval's two co-workers, who Duval said were with him at the time of the auto incident, testified that they saw Duval when Voltair drove by. The ALJ also emphasized that he did not rely on Voltair's testimony because "[h]e was a difficult witness who was very evasive and, on the basis of [the ALJ's] observation of his demeanor, lacking in credibility."
The ALJ then determined that the testimony of Marsha Robinson regarding O'Flynn's demeanor on the telephone in reaction to the postcard campaign was more credible than O'Flynn's characterization. The ALJ "did not credit O'Flynn's testimony that the postcards did not concern her." The ALJ also found Robinson's testimony that O'Flynn thought the protest postcards were inappropriate and disrespectful was more credible than O'Flynn's testimony.
The ALJ then discussed his conclusions of law regarding the section 14(a)(1) allegation. The ALJ noted that section 14(a)(1) prohibits educational employers from "[i]nterfering, restraining or coercing employees in the exercise of the rights guaranteed under [the] Act." The ALJ determined that he would apply the Wright Line[2] test which requires proof of anti-union motivation on the part of the employer for discharging an employee, and the Schaumburg[3] test which does not require proof of anti-union motivation, and held that under either test, the complaint would be dismissed. The ALJ stated that the Union had established a prima facie case under section 14(a)(1) based on the fact that "[a] reasonable employee, knowing that Duval was suspended immediately after GSEU had come to his aide [sic] and that O'Flynn had questioned GSEU's support of Duval * * * could tend to be inhibited from engaging in protected activity," and noted that an employer can defend against a prima facie case by showing a legitimate reason for its conduct. More specifically, the ALJ reasoned that:
"Here, UIC has shown that Duval was suspended pending discharge because he filed a false police report against Voltaire [sic], which he then retracted. A reasonable employee knowing that within approximately a month of his suspension, Duval filed a police report claiming that Voltaire [sic] tried to hit him with his vehicle; that Duval's own friends and co-workers would *1089 not support his story; and that subsequently Duval voluntarily retracted his report, now stating that Voltaire [sic] never did try to hit him, would not tend to be coerced from engaging in protected activity by UIC's discharge of Duval." (Emphasis added.)
The ALJ then analyzed the case assuming that the Union had to show improper motivation, pursuant to section 14(a)(3), on the part of the University in discharging Duval. The ALJ acknowledged that in order to show improper motivation, the Union would be required to prove "(1) the employee engaged in activity protected under Section 3 of the Act, (2) that the employer was aware of that activity, and (3) that the employee was discriminated against for engaging in that activity." The ALJ concluded that the Union presented a prima facie case based on the fact that the Union orchestrated the postcard campaign in behalf of Duval and which Duval participated in, which constituted "lawful concerted activity," but that an employer could defend against such a claim by showing the discharged employee would have been discharged for a legitimate reason. The ALJ noted that "where the employer advances legitimate reasons for discharge and is found to have relied upon them in part, then the case is characterized as one of `dual motive,' and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his protected activity." The ALJ concluded that the University offered a legitimate reason for discharging Duval (filing a false police report against Voltair), the University followed established procedures when discharging Duval and, based upon the preponderance of the evidence, the University would have taken the same action notwithstanding the protected union activity (the postcard campaign).
On August 1, 1994, the Union filed timely exceptions to the ALJ's recommendation and a supporting brief. On September 2, the University filed its response to the Union's exceptions.
On January 26, 1995, the IELRB issued its opinion and order, affirming the ALJ's determination that the University did not violate section 14(a)(1) of the Act.[4] The IELRB adopted the ALJ's findings of fact, and concluded that an employer's motivation must be proven to establish that the employer violated section 14(a)(1) of the Act when the facts alleged to violate section 14(a)(1) could be characterized as a violation of section 14(a)(3) of the Act. The IELRB determined that the facts alleged could be characterized as both a 14(a)(1) and 14(a)(3) violation. The IELRB reasoned that when an employer's conduct is alleged to violate both section 14(a)(1) and 14(a)(3), motivation must be proven, otherwise section 14(a)(3) would become superfluous. The IELRB stated that when "adjudicating alleged Section 14(a)(1) violations which involve union activity and which therefore could have been alleged as Section 14(a)(3) violations, we shall apply a test requiring proof of motivation, similar to the test applied in Section 14(a)(3) cases." (Emphasis added.)
The Union contends that it does not have to show an unlawful motive for Duval's discharge to prove a section 14(a)(1) violation by the University, and that such a showing is applicable only to a section 14(a)(3) violation. The Union also contends that, if this court determines that an unlawful motive must be proven in this case, there is in fact evidence of the University's unlawful motive. Finally, the Union contends that if the instant case is a "dual motive" case, the reason the University provided for Duval's discharge was merely a pretext for its unlawful motive, and the University did not show that Duval would have been terminated notwithstanding his participation in the postcard campaign.
The IELRB and University argue that the IELRB applied the correct test to this case, i.e., pursuant to section 14(a)(3), that the IELRB's decision is not arbitrary and capricious because the decision is consistent with past precedent, and the IELRB correctly held that the Union was required to demonstrate improper employer motivation in order *1090 to establish a section 14(a)(1) violation in this case. The University also argues that in order to show a 14(a)(1) violation, the charging party must prove unlawful motivation as is applicable to a section 14(a)(3) violation; in the present case it had a lawful motive for Duval's discharge; it would have discharged Duval regardless of the contemporaneous union activity; and it did not inhibit other employees from exercising their rights under the Act. The IELRB concluded that "proof of motivation is required when, as here, the facts alleged as a violation of section 14(a)(1) could equally well be characterized as a violation of section 14(a)(3) of the Act."
Administrative proceedings are governed by fundamental principles and requirements of due process of law. Abrahamson v. Illinois Department of Professional Regulation, 153 Ill.2d 76, 92, 180 Ill.Dec. 34, 606 N.E.2d 1111 (1992). "An Illinois court has a duty, under the Administrative Review Act, to ensure that due process was afforded in the administrative hearing." Reich v. Freeport, 527 F.2d 666, 671 (1975). In administrative proceedings, "due process is satisfied when the party concerned is provided an opportunity to be heard in an orderly proceeding which is adapted to the nature and circumstances of the dispute." Obasi v. Dept. of Professional Regulation, 266 Ill. App.3d 693, 702, 203 Ill.Dec. 499, 639 N.E.2d 1318 (1994). To ensure a party receives due process, "`[a]n agency changing its course must apply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" Dehainaut v. Pena, 32 F.3d 1066, 1074 (1994).
The findings and conclusions of law by the IELRB on questions of fact are considered prima facie true and courts may not interfere with the discretionary authority of an agency unless it is exercised in an arbitrary and capricious manner or is against the manifest weight of the evidence. Board of Education of Schaumburg Community Consolidated School District No. 54 v. IELRB, 247 Ill.App.3d 439, 453-54, 186 Ill.Dec. 649, 616 N.E.2d 1281 (1993). "However, the courts of review are not bound by the agency's interpretations of law. Where administration of a broad statutory standard has been delegated to an agency's discretion, the court should rely upon the agency's interpretation where there is reasonable debate as to the statute's meaning." Board of Education v. Illinois Educational Labor Relations Board, 143 Ill.App.3d 898, 907, 98 Ill.Dec. 109, 493 N.E.2d 1130 (1986). The court's review of an agency's statutory interpretation is de novo, however, the agency's interpretation should receive deference because it stems from the agency's expertise and experience. Board of Education of Du Page High School District No. 88 v. IELRB, 246 Ill.App.3d 967, 973, 187 Ill.Dec. 333, 617 N.E.2d 790 (1992).
Agency action is arbitrary and capricious if the agency contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an explanation which is so implausible that it runs contrary to agency expertise. Greer v. Illinois Housing Development Authority, 122 Ill.2d 462, 505-06, 120 Ill.Dec. 531, 524 N.E.2d 561 (1988). "While an agency is not required to adhere to a certain policy or practice forever, sudden and unexplained changes have often been considered arbitrary [and] the standard is one of rationality." Greer, 122 Ill.2d at 506, 120 Ill.Dec. 531, 524 N.E.2d 561.
Illinois case law and previous IELRB rulings clearly set forth the applicable tests for claims brought under 14(a)(1) and 14(a)(3). Under section 14(a)(1), "[o]rdinarily, a showing of unlawful motive is not needed to establish a prima facie case of a violation" (Southern Illinois University (Edwardsville), 5 PERI 1076, No. 86-CA-0018-S (1989)), and section 14(a)(1) has no requirement that unlawful motive be shown by the charging party (Southern Illinois, 5 PERI 1076). The court applies an objective test to determine if a prima facie case has been established. Southern Illinois, 5 PERI 1076. Once a prima facie case has been established, the burden shifts to the defending party, and if the defending party offers an explanation for its conduct, the court must apply a balancing test, "weighing the respondent's need to act for legitimate reasons against any interference with employees' statutory rights." Southern Illinois, 5 PERI 1076.
On the other hand, discriminatory discharge, or discharge which violates section *1091 14(a)(3), "is established by a showing that (1) the employee was engaged in activity protected under section 14(a)(3) of the Act; (2) the [respondent] was aware of that activity; and (3) the employee was discharged for engaging in that activity." Georgetown-Ridge Farm Community Unit School District No. 4 v. IELRB, 239 Ill.App.3d 428, 464, 179 Ill.Dec. 835, 606 N.E.2d 667 (1992). The third part of the test is established if the employee's protected activity was a substantial or motivating factor for the discharge or action against the employee. Hardin County Education Association v. IELRB, 174 Ill. App.3d 168, 174, 124 Ill.Dec. 49, 528 N.E.2d 737 (1988). Once a prima facie case has been established, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the discharge would have occurred but for the protected activity. Georgetown-Ridge, 239 Ill.App.3d at 464, 179 Ill.Dec. 835, 606 N.E.2d 667. "This `but for' test, commonly referred to as the Wright Line test * * * [has] been held by [Illinois courts] to be applicable in discriminatory discharge cases brought under section 14(a)(3) of the Act." Georgetown-Ridge, 239 Ill. App.3d at 464, 179 Ill.Dec. 835, 606 N.E.2d 667. Once a party has offered a reason for the adverse employment action, it must be determined whether the reasons are bona fide or pretextual. City of Burbank v. Illinois State Labor Relations Board, 128 Ill.2d 335, 346, 131 Ill.Dec. 590, 538 N.E.2d 1146 (1989). More specifically, as stated in City of Burbank, 128 Ill.2d at 346-47, 131 Ill.Dec. 590, 538 N.E.2d 1146:
"[W]here the employer advances legitimate reasons for the [adverse employment action] and is found to have relied upon them in part, then the case is characterized as one of `dual motive' and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement."
We find that the IELRB's decision to apply a section 14(a)(3) analysis is arbitrary and capricious. The executive director of the IELRB, in reviewing the Union's claims, determined that the Union had not alleged a violation of section 14(a)(3) and, therefore, the executive director filed a complaint alleging only a section 14(a)(1) violation. In its decision, however, the IELRB found that the facts the Union presented revealed that the Union could have alleged a section 14(a)(3) violation and therefore applied a section 14(a)(3) analysis. This is not only contradictory, but does not afford the Union due process of law. While some of the evidence presented when arguing both a section 14(a)(1) violation and a section 14(a)(3) violation would be the same or similar, the trial strategy may be quite different and a party would necessarily put forth different evidence depending upon which violation it was arguing. The Union in the present case was deprived of the opportunity to put forth evidence supporting a section 14(a)(3) violation because the executive director precluded the Union from alleging such a violation. Yet, the IELRB proceeded to evaluate the Union's case based upon a section 14(a)(3) analysis.
Additionally, the IELRB has arbitrarily determined that a new test would now be applied to section 14(a)(1) violations that "could have been brought as [section] 14(a)(3) violations." This decision would be more palatable if the Union determined which violation would be charged against the opposing party. However, the executive director of the IELRB determines which violations a party may allege. The IELRB simply cannot say, on the one hand, that a party has not provided sufficient evidence to allege a section 14(a)(3) violation, while on the other hand, state that the same party has provided sufficient evidence to implement a section 14(a)(3) analysis.
Because the IELRB concedes that there was sufficient evidence for a section 14(a)(3) claim, we remand the cause and direct the IELRB to order a new hearing as to whether the University violated section 14(a)(3).
For the reasons stated, we reverse and remand, with directions.
Reversed and remanded, with directions.
HARTMAN, P.J., and SCARIANO, J., concur.
NOTES
[1] The Union did not raise this issue in its brief on appeal. Therefore we do not address this issue.
[2] Wright Line v. Lamoureux, 251 NLRB 1083, 1980 WL 12312 (1980), enf'd, 662 F.2d 899 (1981).
[3] Schaumburg Community Consolidated School District No. 54 v. IELRB, 7 PERI 1053, No. 90-CA-0024-C (1991), aff'd in part, rev'd in part, 247 Ill.App.3d 439, 186 Ill.Dec. 649, 616 N.E.2d 1281 (1993).
[4] The IELRB noted that neither party took exception to the ALJ's decision that referral of this case to arbitration would be inappropriate. The IELRB then held that because of this, the ALJ's recommendation was final and binding on the parties.