HIGHLAND PARK CONVALESCENT CENTER, INC., Plaintiff-Appellant, v. THE HEALTH FACILITIES PLANNING BOARD *et al.*, Defendants-Appellees.

First District (6th Division)  No. 1—89—3223

Opinion filed July 19, 1991.

Terrence J. Benshoof and Ronald Scott Mangum, both of Mangum, Smietanka & Johnson, and James E. Dahl, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Highland Park Convalescent Center (HPCC), appeals from an order entered in the circuit court which affirmed the decision of the Illinois Health Facilities Planning Board (Board) to deny the plaintiff's application for a permit to construct a nursing home facility. The plaintiff contends that the Board's decision was against the manifest weight of the evidence; the plaintiff also argues that the Board relied on an unpublished rule in denying its application and thereby deprived the plaintiff of due process.

On May 23, 1984, the plaintiff applied to the Board for a permit to construct a long-term care nursing home facility in Highland Park, Illinois. The application was reviewed by the Health Systems Agency for Kane, Lake and McHenry Counties (Agency), which is a federally funded regional health care planning body that works in conjunction with the Board.

After a public hearing, the Agency governing board voted 13 to 0 to recommend denial of the plaintiff's application. The Agency provided its recommendation to the Board on October 1, 1984, and again on March 14, 1986. The Illinois Department of Public Health also reviewed the application and recommended to the Board that the application be denied.

The plaintiff submitted additional information to the Board in support of its application. Nevertheless, the Agency and the Illinois Department of Public Health again recommended to the Board that the application be denied.

On April 11, 1985, the Board issued a statement of intent to deny the application. The plaintiff once again submitted additional information in support of its application; however, on February 6, 1986, the Board issued an order denying the application.

On February 27, 1986, the plaintiff requested an evidentiary hearing, which was held beginning on January 20, 1987. On February 24, 1987, the hearing officer recommended to the Board that it reverse its decision to deny the application.

The Board reviewed the hearing officer's recommendation and the evidence presented, and on May 6, 1988, the Board affirmed its earlier decision to deny the application. On August 4, 1988, the Board issued its final order denying the application for a permit to construct a nursing home facility in Highland Park.

Before addressing the plaintiff's argument that the evidence was insufficient to support the Board's decision, it is appropriate to

set forth the guidelines imposed on the Board in determining whether to grant a permit to a health care facility.

The applicable statute grants the Board the power to prescribe rules, standards, criteria, procedures or reviews "for recognition for areawide health planning organizations, including, but not limited to, standards for evaluating the scientific bases for judgments on need and procedure for making these determinations." The act also provides that, in developing health care facility plans, the Board should consider a number of factors, including the size, composition and growth of the population of the area to be served; and the number of existing and planned facilities offering similar programs. Ill. Rev. Stat. 1987, ch. 111½, pars. 1162(1), (3), (4).

Pursuant to the legislative grant, the Board determined, based upon "an analysis of socio-economic data, patient origin studies, and planning guidelines," that "planning areas were to be coterminous with county boundaries for health services outside of Cook and DuPage Counties." (Illinois Health Care Facilities Plan, ch. 3, §I, R. 304P(1)(c) (5th ed.).) The proposed health care facility involved in this case is in Lake County.

The Board adopted the following pertinent review criteria:

"(c) Any proposed project *** must demonstrate that its primary purpose and intent is to serve the population of the planning area (as defined in 92 Ill. Adm. Code 1100.220 'Planning Area') in which it will be physically located *** and that its location will not result in a maldistribution of facilities or services. In assessing whether or not a maldistribution of facilities exists, the State Board will evaluate such factors as (but not necessarily limited to) accessibility, patient flow patterns, travel time and distance to existing facilities or services and occupancy rates of existing facilities or services.
*** *

(l) 'Scope and Size of Project'—Review Criteria

The applicant must document that the population served or to be served by a proposed project is in need of the services to be provided. Such documentation must establish the need for the services and also the need for the proposed project (scope, size) in relation to the stated needs of the population served." 77 Ill. Adm. Code §§1110.230(c), (l) (1985).

The Board's principal reason for denying the application was that the proposed facility would be in an area of Lake County that already had a significant number of nursing homes, still leaving other areas of the county inadequately served. The proposed nurs-

ing home, therefore, would constitute "maldistribution" as that term is used in the Board's review criteria.

■ The plaintiff does not analyze the evidence and point out the weakness of the Board's case and the strength of its own. Instead, the plaintiff hinges its entire argument on the fact that the hearing officer, who heard the witnesses, recommended that the application be granted. This argument often recurs, and the courts uniformly reject it. (See *Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 100-01, 454 N.E.2d 265, 269.) The Board, not the hearing officer, is the ultimate fact finder and decision maker. (77 Ill. Adm. Code §1160.630 (1985).) Where an administrative agency is responsible for the decision, the agency is required to consider the findings of the hearing officer, but it is not bound to accept them. Rather, the agency must make its own decision based upon the evidence in the record. (*Gregory v. Bernardi* (1984), 125 Ill. App. 3d 376, 465 N.E.2d 1052.) The rule applies even when findings of fact depend on the credibility of witnesses, and it is the hearing officer who observes the witnesses. *Caracci v. Edgar* (1987), 160 Ill. App. 3d 892, 513 N.E.2d 932.

■ Although the plaintiff, we repeat, did not expressly question the sufficiency of the evidence to support the Board's decision, to put the matter to rest, we hold that the Board's decision was not against the manifest weight of the evidence. The Board heard witnesses testify for and against the plaintiff's application for the creation of a nursing home in the southeast part of the county, which already contains 11 nursing homes; there were nine in the northeast part, but only three in the southwest part and two in the northwest part. The Board chose to accept the testimony against the plaintiff. There is no basis for the substitution of our judgment for that of the Board.

The plaintiff next maintains that the Board used an unpublished rule as a basis for denying its application, thus denying the plaintiff due process.

Mark Mayo was a consultant in health care facilities management, and he formerly worked as Director of Project Review for the Agency. He prepared the Agency's staff report on the plaintiff's application.

The Agency focused primarily on the location criterion. There were no guidelines or rules regarding the interpretation and review in order to determine whether maldistribution of facilities within a planning area existed. In order to determine whether the proposed facility would result in a maldistribution of facilities or services, the

Agency used a methodology whereby they divided the planning area into four "quadrants." Within the quadrants they used population and rate data to determine the need for new health care facilities. The Agency used data from the United States Census Bureau and addressed two age groups: 65 through 74, and 75 and over. The Agency looked at the number of beds in each facility and the service and skill being offered, and they also considered the geographic need in any particular area. The Agency plotted the various facilities on the county map and noted the location of the facilities with regard to the aged population. They determined that there was already a maldistribution of facilities within the planning area, and they determined that the proposed location for HPCC would further that maldistribution.

Raymond Passeri was the Chief of the Division of Facilities Development of the Department of Public Health, and the Executive Secretary of the Board. He also served as the Chief Executive Administrative Officer for the Board in reviewing certificate of need applications and in processing standards and criteria and plans of need.

Passeri testified that the location criterion was a critical issue in the review of the plaintiff's application. The determination with respect to location would be based in part on whether the establishment of the facility would result in maldistribution in the planning area. He explained that maldistribution is a combination of several factors, and that it involves accessibility of the proposed services to the general population, whether there is a concentration of facilities and services in one geographic portion of the planning area, and the availability of support staff for projects and services. He noted that other tools were also used to review maldistribution, including natural barriers such as highway patterns and other types of geographical dividing lines. He testified that the Board's rules do not contain standards for defining maldistribution, and that it is the applicant's duty to show why the proposed location is appropriate.

George Hinton was the Comprehensive Health Planner for the Illinois Department of Public Health. He worked in the certificate of need program and determined whether applicants complied with the Illinois Health Facilities Planning Act. He reviewed the plaintiff's application and prepared a report; he concluded that four review criteria were not met. The unsatisfied criteria were location, alternatives to the proposed project, scope and size, and allocation of additional beds.

Hinton explained that the location criterion is a two-part test: first, he must determine whether the facility would serve the needs of the planning area, and second, he must determine whether the proposed location would result in a maldistribution of facilities or services within the planning area. He stated that "maldistribution" is not defined in the Act; however, the Act lists the following factors to be considered: accessibility, patient flow patterns, time/distance factors, and occupancy rates of existing facilities. Hinton noted that none of these four factors is defined in the Act, and the Act states that the Board is not limited to these four factors.

Hinton discussed the steps he took in reviewing the HPCC application. First, he obtained a map of the planning area and familiarized himself with the map and the location of the various communities and the layout of the townships. Next, he plotted the location of the various long-term care facilities, to determine the concentration of particular services. He was then able to determine what community would be served by the project, and determine whether there was a concentration of services in the planning area. He identified exhibits which are attached to this opinion as appendices A and B. Appendix A is a map divided into quadrants and showing the location of existing nursing homes. Appendix B has a breakdown of population of Lake County and long-term care bed distribution and the population broken down by township and age. Using the exhibits, Hinton determined that there were four townships in the northwest region of the planning area that had 20% of the planning area's elderly population, but had only 6% of the area's long-term care beds. He noted that the region east of the Tri-State tollway, which served as a natural barrier, had 56% of the elderly population and 75% of the long-term care beds. It was his opinion that the plaintiff's proposed location would further the existing maldistribution of facilities in Lake County.

Hinton testified that the Department of Public Health addresses geographical factors in all cases; however, *they do not always divide a planning area into four regions.* He divided the planning area into four regions in this case because he believed that dividing the area in this manner would aid in analyzing the distribution of facilities. In addition to dividing the planning area into quadrants, he also assessed the distribution of facilities using the Tri-State tollway and Route 45 as dividing lines. *Using these alternative analyses, he found that a maldistribution still existed,* as each of these methods still left four townships in the northwest area with a disproportionate lack of long-term care beds.

Hinton found that the plaintiff failed to meet the requirement of showing no alternative projects at a lower cost. He determined that it would be less costly for the plaintiff to locate in the northwest portion of the planning area, where a need existed; building the facility in Highland Park would merely foster greater concentration of long-term care beds in an area where substantial concentration already existed.

He also found that the plaintiff failed to meet the scope and size criteria, which require that the applicant demonstrate that the project's scope and size fit in with the identifiable needs of the planning area population. He determined that the plaintiff could not meet the identifiable needs of the planning area because the need for long-term care facilities was in the northwest portion of the planning area, which the plaintiff's proposed location would not serve.

Hinton stated that he would have a problem with the construction of any Lake County health care facility if it was not in one of the four unserved townships in the northwest quadrant. He testified that there was some sort of public transportation in the northwest region.

■ The plaintiff maintains that the Board's "Quadrant Theory" was a rule which was required to be promulgated in accordance with the Illinois Administrative Procedure Act (IAPA) (Ill. Rev. Stat. 1987, ch. 127, par. 1001 *et seq.*). Because it was not so promulgated, the plaintiff contends that it is invalid. The IAPA defines a rule as an agency statement of general applicability that implements, interprets or prescribes law or policy. (Ill. Rev. Stat. 1987, ch. 127, par. 1003.09.) Rules are the administrative process analogous to legislation, contrasted with orders, which are the product of adjudication, the administrative process analogous to the judicial process. In short, adjudication resembles what courts do in deciding cases, and rulemaking resembles what legislatures do in enacting statutes. 1 K. Davis, Administrative Law Treatise §5.01, at 285-86 (1958).

The plaintiff relies principally on *Senn Park Nursing Center v. Miller* (1983), 118 Ill. App. 3d 504, 455 N.E.2d 153, *aff'd* (1984), 104 Ill. 2d 169, 470 N.E.2d 1029, in which the Illinois Department of Public Aid (IDPA) amended its procedure for calculating the "inflation update" factor for the Illinois State Medicaid plan. In determining rates of reimbursement for nursing homes before January 1, 1980, the IDPA calculated the inflation update factor by comparing the two most recent cost reports of all nursing homes with the Con-

sumer Price Index experience over the same period, and multiplying that factor by the projected price changes for the upcoming year. In December 1979, the IDPA amended this procedure by announcing that it would compare *all* available nursing home cost reports, rather than just the two most recent cost reports. This amended procedure was not promulgated as a rule in accordance with the IAPA. (118 Ill. App. 3d at 507.) Senn Park Nursing Center challenged the validity of the amendment, and both the appellate court and the supreme court held that the amendment was invalid because it was a rule required to be promulgated under the IAPA. (118 Ill. App. 3d at 514; 104 Ill. 2d at 178.) Both courts noted that the inflation update procedure was clearly an agency statement of general applicability that implemented policy. Therefore, because the procedure did not fit within any of the exceptions to the definition of "rule" set forth in the IAPA, it was invalid because it was not promulgated in accordance with the IAPA.

In *Moriearty v. Civil Service Comm'n* (1985), 131 Ill. App. 3d 198, 474 N.E.2d 1291, the plaintiff filed suit challenging the Civil Service Commission's denial of her appeal of her layoff. The plaintiff argued that the statistical methodologies used in assessing the disproportionate impact of layoffs were rules which were required to be promulgated in accordance with the IAPA.

In investigating the propriety of the plaintiff's layoff, the Civil Service Commission used three statistical methodologies which compared the number of white females affected by the layoff to the number of white males affected. (131 Ill. App. 3d at 200.) The appellate court compared the case to *Senn Park* and held that the methodologies were not agency statements of general applicability. They were used to determine the impact of achieving equal opportunity goals for women at that particular facility; they were not generally applicable in all cases. The methodologies were simply reasoning by which the agency reached its decision; therefore, the court held that they were not rules. 131 Ill. App. 3d at 204-05.

Similarly, in this case, the quadrant theory was merely the reasoning by which the agency determined that maldistribution existed; and it was not the only methodology used. George Hinton testified that he also examined the distribution of facilities using the Tri-State tollway as a dividing line and, at the insistence of HPCC, using Route 45 as a dividing line.

Moreover, the quadrant theory used by the Board relates only to this particular nursing home. At the time the Board reviewed the application, it looked at a map of the county's long-term care

distribution, and four "quadrants" became apparent. At another time, when the distribution is different, a different methodology may be more appropriate. The methodology does not purport to treat generally all nursing homes, or even all nursing homes in Lake County. In addition, we independently note that from an examination of the Lake County map, ignoring the division into quadrants, it is apparent that there is a heavy concentration of nursing homes along the eastern quarter of Lake County and a relatively small number of nursing homes on the western three-fourths of Lake County.

■■ The appellate court has noted that "not all statements of agency policy must be announced by means of published rules. When an administrative agency interprets statutory language as it applies to a particular set of facts, adjudicated cases are a proper alternative method of announcing agency policies." (*Kaufman Grain Co. v. Director of the Department of Agriculture* (1989), 179 Ill. App. 3d 1040, 1047, 534 N.E.2d 1259.) In this case, the Board used the quadrant theory to interpret the term "maldistribution" as it applied to the plaintiff's proposed location. Therefore, in accordance with *Kaufman Grain Co.*, an adjudicated case was a proper method for the agency to use. See also *Manor Healthcare Corp. v. Northwest Community Hospital* (1984), 129 Ill. App. 3d 291, 472 N.E.2d 492.

■■ We judge, therefore, that the so-called "Quadrant Theory" used by the Board in this case was not a rule that required promulgation.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.

## APPENDIX A

### LAKE COUNTY PLANNING AREA

NOTE: Refer to next page for numbered listing of facilities

# Appendix B

### TABLE 1
### LAKE COUNTY POPULATION, 1980
### AND LONG TERM CARE BED DISTRIBUTION, 1984

|  | NE | NW | SW | SE |
|---|---|---|---|---|
| Total Population | 136,000 | 74,000 | 55,500 | 173,000 |
| % Lake Co. | 30.88% | 16.80% | 12.60% | 39.28% |
|  |  |  |  |  |
| Population Age 65-74 | 6,600 | 3,900 | 2,150 | 6,300 |
| % Lake Co. | 1.50% | 0.89% | 0.49% | 1.43% |
| % Lake Co. 65-74 | 33.42% | 19.75% | 10.89% | 31.90% |
|  |  |  |  |  |
| Population Age 75+ | 3,950 | 2,100 | 1,300 | 4,500 |
| % Lake Co. | 0.90% | 0.48% | 0.30% | 1.02% |
| % Lake Co. 75+ | 32.78% | 17.43% | 10.79% | 37.34% |
|  |  |  |  |  |
| Number Nursing Homes | 8 | 1 | 3 | 10 |
| % Lake Co. | 22.73% | 4.55% | 13.64% | 45.46% |
|  |  |  |  |  |
| Number Total Beds | 1,344 | 93 | 322 | 1,526 |
| % Lake Co. Nursing Home Beds | 40.91% | 2.83% | 9.80% | 46.45% |
|  |  |  |  |  |
| Number Skilled Beds | 785 | 0 | 61 | 1,203 |
| % Lake Co. Nursing Home Beds | 23.90% | 0.00% | 1.86% | 36.62% |
| % Lake Co. Skilled Beds | 38.31% | 0.00% | 2.98% | 58.71% |
|  |  |  |  |  |
| Number Intermediate Beds | 559 | 93 | 261 | 323 |
| % Lake Co. Nursing Home Beds | 17.02% | 2.83% | 7.95% | 9.83% |
| % Lake Co. Intermediate Beds | 45.23% | 7.52% | 21.12% | 26.13% |

### TABLE 2
### LAKE COUNTY POPULATION BY TOWNSHIP AND AGE, 1980

| Township | Total Population | Ages 0-64 | Ages 65-74 | Ages 75+ |
|---|---|---|---|---|
| Antioch | 15,118 | 13,214 | 1,280 | 624 |
| Avon | 29,938 | 27,969 | 1,267 | 705 |
| Benton | 14,538 | 13,733 | 559 | 246 |
| Cuba | 11,826 | 10,944 | 561 | 321 |
| Deerfield | 35,220 | 31,780 | 2,092 | 1,348 |
| Ela | 19,969 | 18,957 | 599 | 413 |
| Fremont | 12,234 | 11,629 | 393 | 212 |
| Grant | 12,868 | 11,418 | 946 | 504 |
| Lake Villa | 16,114 | 15,284 | 547 | 283 |
| Libertyville | 34,071 | 31,657 | 1,317 | 1,097 |
| Newport | 3,042 | 2,827 | 148 | 67 |
| Shields | 45,132 | 42,758 | 1,377 | 997 |
| Vernon | 32,285 | 31,157 | 722 | 406 |
| Warren | 22,591 | 21,460 | 781 | 350 |
| Wauconda | 11,708 | 10,693 | 599 | 416 |
| Waukegan | 78,471 | 70,575 | 5,015 | 2,881 |
| West Deerfield | 27,386 | 25,863 | 892 | 631 |
| Zion | 17,861 | 16,645 | 654 | 562 |
|  |  |  |  |  |
| TOTAL LAKE COUNTY | 440,372 | 408,560 | 19,749 | 12,063 |

SOURCE: Illinois Assn. of Health Systems Agencies, AIS/CAGIS, Univ. of
Illinois, based on U.S. Bureau of the Census data.