SECOND DIVISION

March 28, 2000

No. 1-98-3254 )

)

BLOOM TOWNSHIP HIGH SCHOOL   ) Petition For Review 

DISTRICT 206, COOK COUNTY, ) From Illinois Educational

ILLINOIS, ) Labor Relations Board.

)

Petitioner, ) Case No. 97-CA-0032-C

)

)

)

ILLINOIS EDUCATIONAL LABOR )

RELATIONS BOARD, ) 

SERVICE EMPLOYEES INTERNATIONAL ) 

UNION, LOCAL 1, and VINCE BOVE, )

) 

Respondents.   )

JUSTICE GORDON delivered the opinion of the court:

Petitioner Bloom Township High School District 206 (the District) appeals from a decision of the Illinois Educational Labor Relations Board (the Board).  In an unfair labor practice charge filed December 9, 1996, and amended on January 13, 1997, respondent Service Employees International Union, Local 1 (the Union), alleged the District violated the Illinois Educational Labor Relations Act (the Act) (115 ILCS 5/1 
et seq.
 (West 1998)) when it discharged respondent Vince Bove, a District custodian, and suspended Morris Bates, also a custodian.  Following a hearing, an administrative law judge found there was no violation of the Act.  The Union filed exceptions to that decision as to Bove, and the Board subsequently reversed, concluding the District's discharge of Bove did violate the Act.  The District argues on appeal that the Board had no jurisdiction to hear the Union's exceptions because they were not timely filed, and therefore the administrative law judge's decision must stand.  In addition, the District contends it discharged Bove for a legitimate business reason and not for his protected union activity, and that the Board's reversal therefore is contrary to the law and against the manifest weight of the evidence.  For the reasons set forth below, we affirm.  

BACKGROUND FACTS

The basic facts involving this case are substantially undisputed.
(footnote: 1)  

A. The District Policy and Bove's Employment History 

Under a District policy dating to January 1988, maintenance and custodial staff were not allowed to leave the building during their 15-minute coffee breaks.  In addition, anyone leaving the building during the 30-minute lunch break was required to punch out and then punch back in when returning. If an employee's assigned duties required him to leave the building to empty trash, for example, or to go to another school building on the campus, punching out was not required.    

As part of a settlement agreement in a previous unfair labor practice charge, the District and the Union agreed that the punching-in-and-punching-out rule would be strictly enforced beginning with the 1996-97 school year.  According to John Dolak, then the District's assistant superintendent for business, the rule was posted at the beginning of that school year.  

Bove worked as a custodian at Bloom High School in Chicago Heights, Illinois, from February 1985 until his termination on November 12, 1996.  During that time, he received seven written reprimands and two suspensions for improper conduct.  Two of the reprimands and both suspensions stemmed in part from violation of the above-mentioned rule.   

On February 17, 1987, Bove was warned in writing about his failure to vacuum an entrance rug, and on May 8, 1987, he was given a written reprimand for inadequate cleaning of washrooms.   The following October 1, he was reprimanded for being absent from work on September 28, 1987.  He was not found during a one-hour search of the building, and thereafter was warned to report to the night foreman when leaving the building and to record his time in and out on his time card.

On February 29, 1988, Bove received a written reprimand and a one-day suspension without pay for being absent from work and failing to follow the requirement to punch in and out.  The reprimand stemmed from an incident on February 27 when he could not be found in the school building from 2:55 a.m. to 3:40 a.m. On his return, he said he had been on a coffee break starting at 3:15 a.m.  Bove filed a grievance over the one-day suspension, which he served on March 16, 1988, claiming lack of formal notice.  The District superintendent denied the grievance. 

A reprimand recommending Bove's dismissal was issued the following year. On April 28, 1989, Bove was found in the teachers' lounge watching television with his shoes off and his feet propped up.  The May 3 reprimand cited that incident as well as Bove's ongoing failure to punch out and back in when leaving the building.  As a result, the District 206 Board of Education (the School Board) suspended Bove for 27 days without pay, noting that this constituted a final warning and that any future misconduct of any type would result in a recommendation for his dismissal.   

On January 15, 1993, Bove was reprimanded for failing adequately to clean locker rooms and the school's small gym.  A year later, he was reprimanded for failure to use (and for improper use of) the building's security system, which records when an employee enters and leaves an area of the building.  In addition, on an occasion in 1992 or 1993, Bove reportedly could not be found in the school building, but there is no indication of any resulting discipline. 

B. Bove's Union Activity

The respondent Union is the exclusive representative of custodians employed by the School Board.  Besides his 1988 grievance over his one-day suspension, Bove also filed a grievance (apparently in 1995) after being passed over for a plumber's position.  In addition, Bove was a central figure in an unfair labor practice charge the Union filed against the School Board in 1995.  That charge was later settled.  At the hearing on the Union's subsequent charge arising from Bove's dismissal, Dolak, the District's assistant superintendent for business, testified he was aware that Bove was an active union member because Bove attended meetings between the Union and District management.     

In June or July of 1996, Bove telephoned Union vice president Nicholas Belsanti and complained that vacant positions in the District were not being filled.  He also voiced concern that the custodians' assigned work areas were becoming too large, and that the District was not providing updated job descriptions.  In late July, Belsanti and Union representative Dan Baisden met with the Bloom High School custodians, who complained that the Union was not doing enough to make sure the District posted and filled vacant positions.   

Bove was acting chief union steward in the fall of 1996.   On August 26, 1996, he and other Union members met with District representatives to discuss the posting and filling of job vacancies.  Also discussed at that meeting was a District proposal to combine a vacant electrician's position with a supervisory position.  Under that proposal, instead of hiring a new electrician, the District would shift those duties to John Romano, the District's supervisor of buildings and grounds.  The Union members rejected the proposal.  Belsanti testified that Bove and another custodian, Morris Bates, were the most vocal in their opposition, and that Bove was more vocal than Bates.  Dolak, the assistant superintendent for business, testified he did not recall either Bove or Bates saying anything about the proposed consolidation.   

The two sides met again on September 18, 1996, to discuss the posting and filling of vacant positions.  According to Dolak, there was general frustration among the Union members present because of the delay in posting and filling the positions.  He added that Dominic Camilleri was the most vocal in voicing that frustration.  Dolak also testified that Bates expressed concern that his work area was too big, and that Bove spoke in support of Bates on that issue.  Bove testified that the proposed consolidation of the electrician and supervisory positions was again raised and that he and other Union members continued to reject it.  Bates testified specifically that he and Bove and Jim Fisher, then the Union's recording secretary, all objected to that proposal at the September 18
th
 meeting.  However, Dolak testified that once the Union rejected the proposal at the August 26
th
 meeting, "[t]hat was the end of it, as far as we were concerned."  He testified that the matter did come up again in talks with Union representatives, but that was in February 1997. Another meeting was held a month later, on October 25
, 1996, and job postings again were discussed.  Dolak testified that Union member Sherwin Kennedy spoke at that meeting about job postings.   

C. Alleged Anti-union Statements

On December 12, 1995, John Romano, the District's supervisor of buildings and grounds, did a building check at Bloom High School but could not find Bove.  Custodian Jim Fisher assisted Romano in the search, and they found Bove mopping a stairwell in his area.  Bove asked Romano why he was looking for him, and Fisher testified that Romano said, "I'm here to check on you."   Bove responded angrily, and Romano suggested they move to a nearby laundry room.  According to Fisher, while they were in the laundry room, Romano told Bove he had "orders from across the street" and that "this was a tit for tat because of the grievance" Bove had filed.  Romano gave a different account, testifying that he told Bove he must punch out if he went out to lunch and that it was his "God-given right to file a grievance."   The administrative law judge (ALJ) found Fisher's testimony more credible on that matter and did not credit Romano's denial.    

Fisher also testified that in the spring of 1997, following a meeting on the termination of an employee, Fisher, Romano and foreman Dan Kieper were walking out of the meeting when Romano said the men who had been called "are all telling lies."  According to Fisher, Romano also said, "the fucking union that backed these people, they ought to get rid of all of them."  Romano also denied those statements, but the ALJ found Fisher's testimony more credible on that conversation as well.   

In addition, Fisher testified that, during the summer of 1996, School Board member Robert Maros told him "there's a lot of trouble on the night shift" and that "the men are out of control and we're just going to have to bring them in some."  Maros denied making those statements, but again the ALJ credited Fisher's testimony.  However, she found that the comment did not necessarily show anti-union animus.   

D. The October 16, 1996, Incident

In October 1996 Bove was working the night shift, which started at 3 p.m. and went to 11:30 p.m.  On October 16, 1996, two School Board members, Robert Maros and "Mr. Deluca,"
(footnote: 2) made a surprise visit to Bloom High School.  According to Maros, both he and Deluca had heard reports that the night custodians were not in their work areas during work hours, so they decided to go to the school to determine if the reports were true.  Maros also testified they were not looking for any particular custodian that night, and that he did not know Bove prior to October 16. Maros testified that he and Deluca entered the building's maintenance area at 7 or 7:15 p.m. and began looking for Armando Maddamma, the night supervisor.  According to Maros, they were unable to find Maddamma and were preparing to leave when Bove entered through the outside doors of the building sometime after 7:30 p.m.  Maros said he saw Bove hang a coat in his locker.  He also testified that he asked Bove if he punched out when he left and punched in when he returned, and Bove replied that sometimes he did and sometimes he didn't.  Maros said the question was a general one and that he was not asking Bove if he punched in and out on that particular night.  According to Maros, the conversation ended then, but Bove testified he asked the School Board members if they had seen Maddamma.  Bove said he told them if they did see him, to tell him the lights in the field house were not working properly.  Maros denied Bove told them that, and denied Bove said anything about the field house.  Maros also testified he considered Bove's response that night to be discourteous and that Bove's attitude showed he "didn't really care."    

Maros said he and Deluca saw one other custodian in a hallway that night and asked him if he knew where Maddamma was.  Maros said they did not know the name of that custodian.  Bates testified he saw the two School Board members that night and that Maros asked him where Maddamma was.  He said Maros also asked him if anyone punched out "around here," and Bates told him maybe no one went out to lunch that night.     

The School Board members reported the incident with Bove to the District's administrators.  Dolak testified that Maros told him he saw lights in the parking lot and then saw Bove coming in from the parking lot with his coat on.  Maros said he reported that Bove was 15 to 25 minutes late in returning from lunch, which was to have ended at 7:30 p.m.   

Near the end of October, Bove attended a meeting in District superintendent Ronald Patton's office to discuss his employment status.  Fisher, the Union recording secretary, was called into the meeting as Bove's Union representative.  During the meeting, Dolak went over Bove's prior disciplinary history.  In addressing the October 16
th
 incident, Bove said he did not 
take a lunch break that night because he was busy cleaning the small gym used by the alternative school program.  According to Dolak, Bove also explained he had moved his car from one parking lot to another, and said that is probably what the School Board members witnessed when they saw headlights and then saw him coming into the building.  On October 30, 1996, Patton, the District superintendent, notified the School Board that the administration was recommending that Bove be terminated.   

The School Board met on November 12, 1996, and Bove attended, accompanied by a Union representative and the Union's lawyer.  Bove was allowed to explain what happened on October 16
th
.  According to Dolak, Bove said he was in the area of the field house and was asked by a person who was renting the field house (for volleyball) to assist in turning the lights on.  Bove's testimony before the ALJ corresponds with that account.  In that testimony, Bove said he noticed people heading for the field house so he went there, and on the way he met a man who was head of the volleyball program.  The man asked him for help in turning on the lights and Bove agreed, but when he got to the switches, he was not able to make all of them work.  Bove said he told the man he would find Maddamma and tell him to fix the lights.  Bove then said he walked through the parking lot to get to the maintenance room in the main building, and that is when he saw Maros.  

Dolak gave the School Board a written summary of Bove's disciplinary record, including the October 16, 1996, incident.   The School Board voted at the November 12
th
 meeting to terminate Bove.  Maros said he voted to discharge Bove because of his prior disciplinary record and because of the October 16
th
 incident.  He also testified that he was not aware at that time of any union activity on Bove's part.  Maros also said Deluca did not vote to terminate Bove.   

E. Discipline of Other Employees

Sherwin Kennedy, another custodian, was president of the local Union by September 1996.  Sometime in 1996, he received a two-day suspension for not punching in and out.  On October 16, 1996, the night of Bove's incident with the School Board members, Kennedy took an extended lunch break.  When questioned, he admitted it, and received a letter of reprimand.  Dolak testified that Kennedy was given less severe discipline than Bove because Kennedy admitted his wrongdoing and because he had not left the building.  Kennedy was subsequently terminated in May 1997 for falsifying a time record and for insubordination.  He also had a lengthy record of work-related infractions. 

In December 1996, custodian Morris Bates was given a two-day suspension for failing to sweep stairwells in his area, and for being in a gym watching a basketball game when he should have been working.  Bates, who also was active in the Union, asserts he did clean the stairwells and that he was in the gym not to watch a basketball game but to find a coworker who had keys to a room Bates was unable to enter.  Initially Bates also was charged with leaving trash on an elevator, but a District investigation showed the garbage could not have been his, and the original three-day suspension was then reduced to two.   

Nevertheless, other employees who were active in the Union and who spoke out at the meetings with District management were not disciplined.    

F. Proceedings Before the Administrative Law Judge and the Illinois Educational Labor Relations Board

Following Bove's dismissal, the Union filed an unfair labor practice charge on December 9, 1996, and an amended charge on January 13, 1997.  The Union claimed that both Bove's discharge and Bates' suspension a month later were in retaliation for their active role in the Union, particularly their opposition to the District's proposal to allow Romano to perform both his supervisory duties and those of an electrician.  Following an investigation, the executive director of the Illinois Educational Labor Relations Board (the Board) filed a complaint with the Board.  Dated April 21, 1997, the complaint alleges the District terminated Bove and disciplined Bates because of their Union activities, and thus violated sections 14(a)(1) and (3) of the Illinois Educational Labor Relations Act (the Act) (115 ILCS 5/14(a)(1), 5/14(a)(3) (West 1998)).  A hearing was held on June 9 and 10, 1997, and July 30, 1997, and the Union and District filed post-hearing briefs on September 15, 1997.  On November 17, 1997, the ALJ who conducted the hearing issued a recommended decision and order. She found that the Union had established a 
prima facie
 case but that the District had proved that Bove and Bates would have been disciplined even if they had not engaged in protected activity.  Therefore, she found no violation of sections 14(a)(3) or (1) of the Act.  The Union received the decision on November 18, 1997.     

By letter dated December 8, 1997, Bove informed the Board he had not received a copy of the decision, and he requested a 30-

day extension to file exceptions.  Bove also sent letters to the District superintendent and the District's attorneys indicating he intended to ask for an extension.  The Board received copies of those letters on December 8, 1997, and it received Bove's request for an extension on December 9.  In a letter dated December 8, 1997, the Board granted an extension to January 8, 1998.  On that date, the Union filed exceptions to the ALJ's decision as to Bove.  By letter dated January 29, 1998, the District requested an extension to February 17, 1998, in which to file a response to the exceptions.  The Board received the letter on February 2, 1998, and granted the request.  The District's response was filed on February 17, and the Board issued its opinion and order on August 17, 1998.  In that opinion, the Board found that the Union had established "a strong 
prima facie
 case" but that the District had shown legitimate reasons for discharging Bove.  Nevertheless, the Board pointed to evidence demonstrating the District's anti-union motivation, and found the District had failed to show that Bove would have been discharged notwithstanding his Union activity.  Hence, the Board found the District did violate sections 14(a)(3) and 14(a)(1) of the Act.   This appeal followed. 

ANALYSIS

A. The District's Jurisdictional Argument

The District argues Bove was not the proper person to seek an extension to file exceptions and that even if he were, his request was untimely.  The District also argues that Bove did not show that compliance with the original deadline would have been unduly burdensome.  In addition, the District contends that because the Union received a copy of the ALJ's decision in a timely manner, Bove's claim that he could not comply with the 21-

day deadline does not apply to the Union.  The District thus asserts the Union's exceptions were untimely filed and therefore the Board lacked jurisdiction to hear them.  The Board counters that the District failed to make those arguments when it filed its response to the exceptions, and therefore the jurisdictional arguments are waived.  It is true that arguments or objections not raised during administrative proceedings are deemed waived and cannot be asserted for the first time on judicial review.  
Board of Education of City of Chicago v. Illinois Educational Labor Relations Board
, 289 Ill. App. 3d 1019, 1021, 682 N.E.2d 398, 399 (1997) [hereinafter 
City of Chicago
]; 
Wegmann v. Department of Registration and Education
, 61 Ill. App. 3d 352, 357-58, 377 N.E.2d 1297, 1302 (1978).  Nevertheless, such waiver does not apply when the jurisdiction of the administrative forum to hear the case is being challenged. 
Henriksen v. Illinois Racing Board
, 293 Ill. App. 3d 569, 571, 688 N.E.2d 771, 773 (1997) (where Illinois Racing Board's jurisdiction was challenged on appeal, court noted that "parties may object to jurisdiction at any time").  Here the District is challenging the Board's jurisdiction to hear the Union's exceptions, and for that reason waiver does not apply.  The District has not waived its jurisdictional arguments.       

Preliminarily, the standard of review governing the jurisdictional issue must be discussed.  The District contends it is a question of law and is therefore reviewed 
de novo
, but the Board argues it is a mixed question of law and fact and is reviewed under a clearly erroneous standard.  While an administrative agency's findings on questions of fact are deemed 
prima facie
 true and correct and are reversed only if found to be against the manifest weight of the evidence, an agency's findings on a question of law are reviewed 
de novo
.  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).  Where the agency's findings are a mixed question of law and fact, the appropriate standard is whether the decision was clearly erroneous, falling between the standard that applies to pure questions of law and that applying to pure questions of fact, "so as to provide some deference to the [agency's] experience and expertise."  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.
(footnote: 3)  We agree with the Board that the issue here is a mixed question of law and fact.  In deciding the issue, the Board had to make a factual determination as to when the request for an extension was filed.  It also had to make a legal determination as to whether the proper person filed the request and what was the legal effect of submitting the request on that date. 
 Hence the applicable standard of review here is whether the Board's granting of the extension and its assertion of jurisdiction were clearly erroneous. 
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  We note however that even if the standard of review were 
de novo
, it would make no practical difference in the deference accorded the Board here.  Though purely legal issues such as statutory construction are reviewed 
de novo
, "courts will defer to an agency's construction of the statutes it administers unless the agency's interpretation is unreasonable or erroneous." 
Board of Education of Community High School District No. 155 v. Illinois Educational Labor Relations Board
, 247 Ill. App. 3d 337, 344, 617 N.E.2d 269, 274 (1993) [hereinafter 
District No. 155
].

With respect to the argument that the request for extension was improperly brought, the District argues that Bove was the wrong person to submit the request because he was not the party that brought the unfair labor practice charge.  Because it was the Union that brought the charge, the District contends it was the Union that should have requested the extension. Since it did not, the District asserts the January 8, 1998, date when the Union filed its exceptions was well beyond the 21-day limit, and the Board therefore had no jurisdiction to hear them.

According to the District, the Board's own rules regarding extensions refer only to "the party" and do not allow "any person affected" to seek an extension.  The Illinois Administrative Code provides that: 

"In all proceedings before the Board, extensions of time will be granted only upon timely written motion to the General Counsel, if the matter is before the members of the Board, or the presiding hearing officer if the matter is before a hearing officer, and only upon a specific showing that compliance with the deadline would be unduly burdensome for the party seeking the extension, and the extension will not unduly delay the proceeding ***"  80 Ill. Adm. Code §1100.30(d) (1990).  

That section of the code does indeed refer to "the party," but it does not explicitly state that only a party may request an extension.  In addition, nowhere does it state that "any person affected" may not seek an extension, nor does the District point us to any case that so holds.  As noted above, administrative agencies such as the Board are given substantial deference in construing their own statutes and rules (
District No. 155
, 247 Ill. App. 3d at 344, 617 N.E.2d at 274
), 
and the role of a reviewing court is limited to "determining whether the Board's construction and application [are] plainly erroneous or inconsistent with long-settled construction" (
Charter Medical of Cook County v. HCA Health Services of Midwest, Inc.
, 185 Ill. App. 3d 983, 987, 542 N.E.2d 82, 84 (1989)).  Although Bove is not the party that brought the unfair labor practice charge, he is clearly the person on behalf of whom the Union's exceptions were filed, and hence is something more than merely "any person affected" by the decision.  We do not find that the Board was clearly erroneous in accepting the request for extension from  Bove.  Moreover, though the District cites cases to support its contention that the Board strictly construes its rules, it provides nothing indicating any "long-settled construction" that only parties and not "any person affected" may seek an extension. Therefore, we have no reason to challenge the discretion of the Board to accept the request from Bove.  

The District next argues that even if Bove was the proper person to seek an extension, that request itself was untimely. The Illinois Administrative Code provides that: 

"In cases in which there is a recommended decision, the parties may file exceptions to the hearing officer's recommendation and briefs in support of those exceptions.  Briefs and exceptions shall be filed no later than 21 days after service of the recommendation.  *** Any party to the proceeding may file a response to any exceptions and supporting briefs within 21 days from receipt of a party's exceptions and supporting brief. *** If no exceptions have been filed within the 21-day period, the parties will be deemed to have waived their exceptions."  80 Ill. Adm. Code §1120.50(a) (1990).  

According to the District, because the ALJ's decision was served by certified mail on November 17, 1997, exceptions and any supporting briefs were due on or before December 8, 1997
(footnote: 4) (21 days thereafter).  Instead, Bove sought an extension by letter dated December 8, 1997, which was received by the Board on December 9.   Hence, the District claims the request for extension itself was untimely and should not have been granted.

The District's argument here is premised on the assumption that the 21-day period begins to run on the day the ALJ's decision is mailed.  However, it is the date when the decision is 
received
 that starts the 21-day clock running.  In 
City of Chicago
, 289 Ill. App. 3d at 1021, 682 N.E.2d at 399-400, the court noted that under the Illinois Administrative Code (80 Ill. Adm. Code §1120.50(a) (1990)), "a party may file exceptions to an administrative law judge's recommended decision and order no later than 21 days after 
receipt
 of the recommended decision."  (Emphasis added.)  In the instant case, the Union received the ALJ's decision on November 18, 1997, which means the 21-day period expired on December 9, 1997, the date Bove's request for extension was received by the Board.  In point of fact, this is consistent with the District's own position in arguing that it is the date the Board 
received
 the request for extension that should govern.  In its letter dated December 8, 1997, the Board granted the extension.  It was not clearly erroneous for the Board to conclude that Bove's request was timely filed.  

The District also argues that even if Bove's request for an extension is deemed timely, he did not show how compliance with the original deadline would have been unduly burdensome, as required by the Illinois Administrative Code. 80 Ill. Adm. Code §1100.30(d) (1990).  However, Bove did explain in his request that he had not received a copy of the ALJ's decision and that he needed an extension to review the decision and prepare exceptions.  The District also argues that because the Union received a copy of the decision on November 18, 1997, Bove's claim that he could not comply with the 21-day deadline does not apply to the Union.  Nevertheless, in his request, Bove stated the Union had not notified him of the decision.  At minimum it appears an extension was needed so Bove could discuss the decision with his Union.   

Moreover, even if no exceptions are filed, the Board has 
authority to review an ALJ's recommendation on its own motion.  80 Ill. Adm. Code §1120.50(b)(1990).  In 
Chicago Teachers Union, Local 1 v. Chicago School Reform Board of Trustees
, Ill. Educ. Labor Relations Bd. Op. 96-CA-0047-C, 13 PERI ¶1110 (August 22, 1997), the Board chose to address an issue not raised in the exceptions, noting it had independent authority to review an ALJ's recommendation under section 1120.50(b).  The Board in the instant case thus would have had jurisdiction over this case even if no exceptions had been filed.  We therefore find that the Board was within its discretion in granting the extension requested by Bove.  It was not clearly erroneous for the Board to assume jurisdiction over this case.  

B. The District's Motivation for Discharging Bove

The complaint heard by the ALJ alleges that the District discharged Bove because of his Union activities in violation of sections 14(a)(1) and (3) of the Illinois Educational Labor Relations Act (the Act) (115 ILCS 5/14(a)(1), 5/14(a)(3) (West 1998)). The District argues that the Union failed to establish a 
prima facie
 case of such discriminatory discharge, and that even if it did establish a 
prima facie
 case, the District has shown there were legitimate reasons for the discharge and that those reasons motivated its decision to terminate Bove. 

Section 14(a) of the Act provides in pertinent part:

"Educational employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.

***

(3) Discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization."  115 ILCS 5/14(a)(1), 5/14(a)(3)(West 1998).  

Section 14(a)(3) applies to discrimination based on union activity, while section 14(a)(1) covers adverse action against an employee because of other protected concerted activity. 
General Service Employees Union, Local 73 v. Board of Trustees of the University of Illinois
, Ill. Educ. Labor Relations Bd. Op. 94-CA-

0016-C, 11 PERI ¶1019 at IX-70 (January 26, 1995) [hereinafter 
University of Illinois
].  Where, as here, an alleged violation of section 14(a)(1) is based on the same conduct as an alleged section 14(a)(3) violation, the section 14(a)(1) violation is essentially a derivative violation.  
Carmi Education Ass'n v. Carmi Community Unit School District 5
, Ill. Educ. Labor Relations Bd. Op. 88-CA-0024-S, 6 PERI ¶1020 at n.12 (January 11, 1990).  In such cases where an employer's conduct is alleged to violate both sections, the applicable test is the one used in section 14(a)(3) cases requiring proof of improper motivation on the employer's part.  
University of Illinois
, 11 PERI ¶1019 at IX-71
; 
Georgetown-Ridge Farm Education Ass'n v. Georgetown-Ridge Farm Community Unit School District 4
, Ill. Educ. Labor Relations Bd. Op. 90-CA-0047-S, 90-CA-0048-S, 7 PERI ¶1106 at IX-422 (October 2, 1991) [hereinafter 
Georgetown Ridge
], 
aff'd in relevant part
, 239 Ill. App. 3d 428, 606 N.E.2d 667 (1992).  Under that test, the complainant must first establish a 
prima facie
 case by proving that (1) the employee was engaged in activity protected by section 14(a)(3) of the Act, (2) the employer was aware of that activity, and (3) the employee was discharged for engaging in that activity.  
General Service Employees Union, Local 73 v. Illinois Educational Labor Relations Board
, 285 Ill. App. 3d 507, 516, 673 N.E.2d 1084, 1090-91 (1996) [hereinafter 
GSEU Local 73
]; 
University of Illinois
, 11 PERI ¶1019 at IX-71; 
Georgetown Ridge
, 7 PERI ¶1106 at IX-422.  

Because the test of discrimination under section 14(a)(3) and (derivatively) section 14(a)(1) turns on motive and because motive is a question of fact (
City of Burbank v. Illinois State Labor Relations Board
, 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149-50 (1989)), the Board's findings are deemed 
prima facie
 true and correct, and we are limited to determining whether they are against the manifest weight of the evidence.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  
In other words, reversal is proper only if no rational trier of fact could have reached the same conclusion, "looking at the evidence in the light most favorable to the agency."   
District No. 155
, 247 Ill. App. 3d at 344, 617 N.E.2d at 274. 

The District argues first that the Union did not establish a 
prima facie
 case.  Activity protected by section 14(a)(3) refers to union activity (
University of Illinois
, 11 PERI ¶1019 at IX-

70), and there is ample evidence that Bove was engaged in union activity.  Thus the first element of the 
prima facie
 case is met. In the fall of 1996, Bove was acting chief union steward.  In addition, he took part in at least three meetings between the Union and District management.  He also opposed the District's proposal for Romano to perform electrician's duties as well as his supervisory duties, and he supported Bates' complaint that his work area was too large.  Moreover, Bove sought the Union's assistance in urging the District not to delay posting vacant positions.  The second element of the 
prima facie
 case also is met.  It is undisputed that the District's management was aware of at least some of those activities.  

The third element of the test is satisfied if the protected union activity was a substantial or motivating factor in the discharge.
 
GSEU Local 73
, 285 Ill. App. 3d at 516, 673 N.E.2d at 1091. Such anti-union motivation may be inferred from various factors, including:

"an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities [citation], proximity in time between the employee['s] union activities and [his] discharge [citation], disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action [citations], inconsistencies between the proffered reason for discharge and other actions of the employer [citation], and shifting explanations for the discharge [citations]."  
City of Burbank
, 128 Ill. 2d at 346, 538 N.E.2d at 1150. 

Here, the Board asserts anti-union motivation can be inferred from the District's expressed hostility to unionization, as seen in the statements of John Romano, the District's supervisor of buildings and grounds.  The Board points to Romano's statement on December 12, 1995, that he was there to check on Bove, that he had "orders from across the street," and that "this was a tit for tat because of the grievance" Bove had filed.  The Board also cites Romano's statement in the spring of 1997 that the "fucking union that backed these people, they ought to get rid of all of them." In its opinion and order, the Board noted that the reference to "orders from across the street" showed that the anti-union motivation was not limited to Romano himself.  

The Board also notes the proximity in time between Bove's union activities and his discharge.  Bove was acting chief union steward in the fall of 1996, he took part in labor management meetings on August 26, September 18 and October 25, 1996, and during that period he opposed a District proposal to combine electrician's duties with those of a supervisor.  Five days after the last of those meetings, the District superintendent notified the School Board that the administration was recommending Bove's dismissal.  In addition, two School Board members made a surprise visit to Bloom High School on October 16, 1996, during which the Board asserts they focused on Bove, questioning him about the punching-in-and-out requirement. Based on all those factors, the Board concluded that anti-union animus was a basis for Bove's discharge and that his union activity was a substantial and motivating factor in his dismissal.  Hence, the Board concluded that the third element of the 
prima facie
 test was met and that the Union had established a 
prima facie
 case.    

The District disagrees, relying on 
Teamsters Local 726 v. Village of Glenwood
, Ill. State Labor Relations Board General Counsel Op. S-CA-96-145, 13 PERI ¶2023 (April 24, 1997).  In 
Village of Glenwood
, the discharged public works employee had been instrumental in organizing his coworkers and obtaining union representation for them.  During the organizing period, the public works director had made negative comments about unionizing but subsequently made comments that welcomed or were indifferent to the existence of a union.  The discharged employee also had been disciplined a number of times for various incidents of misconduct, some of which predated his union activity but others of which were contemporaneous with it.  Incidents for which he was disciplined included falsification of information regarding a punching-out requirement, plowing up sod while snowplowing streets, leaving a truck unattended overnight with the key in the ignition, and backing a truck into a pickup truck (causing $1,400 in damage).  He also was warned shortly before his termination that any further disciplinary problems would result in his dismissal.  The general counsel in 
Village of Glenwood
 found no 
prima facie
 case had been established. She held that anti-union animus could not be inferred from any pattern of conduct, or from any shifting explanations or inconsistency in the reasons given for the discipline.  She asserted that the only circumstance from which an inference of animus could be drawn was the timing of the discipline, but added that coincidence of timing alone is insufficient to support such an inference. 

The District notes that in the instant case, just as in 
Village of Glenwood
, Bove had a history of misconduct, and he had been repeatedly disciplined and warned about his misconduct.  The District also notes correctly that proximity in time is insufficient by itself to sustain an unfair labor practice charge. 
Hardin County Education Ass'n v. Illinois Educational Labor Relations Board
, 174 Ill. App. 3d 168, 185, 528 N.E.2d 737, 747 (1988); 
Buckman v. Township High School District #211
, Ill. Educ. Labor Relations Bd. Administrative Law Judge Op. 94-CA-

0003-C, 11 PERI ¶1081 (September 22, 1995), 
aff'd in part, rev'd in part on other grounds
, Ill. Educ. Labor Relations Bd. Op. 94-

CA-0003-C, 12 PERI ¶1068 (July 17, 1996). However, the District argues incorrectly that timing is the only circumstance in the instant case from which an inference of anti-union animus could be drawn, and that the Union therefore did not establish a 
prima facie
 case.  Here timing was not the only factor relied upon by the Board, which also found anti-union motivation in Romano's statements and in the "target[ing]" of Bove by two School Board members.  We thus find 
Village of Glenwood
 inapposite, and hold that, in the instant case, the Board's conclusion that the Union established a 
prima facie
 case was not against the manifest weight of the evidence.  

Once a 
prima facie
 case has been established, the burden shifts to the employer to show by a preponderance of the evidence that it had a legitimate reason for discharging the employee and that the employee would have been fired for that reason, regardless of his union activity. 
City of Burbank
, 128 Ill. 2d at 346, 538 N.E.2d at 1150; 
GSEU Local 73
, 285 Ill. App. 3d at 516, 673 N.E.2d at 1091.  "Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry ***."  
City of Burbank
, 128 Ill. 2d at 346, 538 N.E.2d at 1150.  It must then be determined if the reason offered is 
bona fide
 or pretextual. 
GSEU Local 73
, 285 Ill. App. 3d at 516, 673 N.E.2d at 1091.  If the reasons advanced are legitimate and the employer is found to have relied on them in part, the case is then one of "dual motive," and the employer must show by a preponderance of the evidence that the employee would have been discharged notwithstanding his union activity. 
City of Burbank
, 128 Ill. 2d at 346-47, 538 N.E.2d at 1150. 

It is undisputed that the District demonstrated it had a legitimate reason for discharging Bove.  He had a prior record of misconduct, at least part of which stemmed from his apparent unwillingness to follow work rules such as the requirement to punch out when leaving the building for lunch.  Assistant Superintendent Dolak believed Bove left the building on October 16, 1996, without punching out and back in, which is a violation of that rule, a rule that was being strictly enforced at the time.  School Board member Maros testified he saw Bove enter the building that evening and hang a coat in his locker.  Bove also gave one explanation to Dolak as to what happened October 16, and a different account when he appeared before the School Board.
(footnote: 5)  In addition, there is evidence that the District and School Board relied on both the October 16 incident and Bove's previous disciplinary history as a reason for terminating him.  Maros testified that he voted to discharge Bove because of the October 16 incident and because he "had been absent from his work place in many instances over the past."   Dolak gave the School Board a written summary of Bove's disciplinary record, which included seven written reprimands in addition to the October 16 incident. Moreover, Bove's misconduct was discussed at the November 12, 1996, School Board meeting that culminated in his termination. 

Nevertheless, the Board contends it was the District's anti-

union motivation that was controlling, and that without that motivation, Bove would not have been fired.  In support, the Board points to the same evidence that demonstrated a 
prima facie
 case was established: the anti-union statements of Romano, the timing of Bove's discharge (close to his union activity), and the two School Board members' surprise visit to Bloom High School during which the Board asserts they "focused on Bove."  

In addition, the Board notes that Bove was disciplined repeatedly in the past but was not discharged until his union activity increased.  Bove was warned in 1989 that any future misconduct would result in a recommendation for his dismissal, but he was not discharged in 1993 when he failed to clean his area or in 1994 when he failed to use a security system properly.  
 
Cf
. 
Alco Electric Co.
, 258 NLRB 819 (1981) (discriminatory discharge found where employee was warned repeatedly about his slow work but was not discharged until after employer learned he had contacted union).  The Board also notes that the District apparently failed to discipline Bove when he was found not to be in the building on one occasion in 1992 or 1993.  

The District relies on 
District 230 Custodian & Maintenance Ass'n v. Consolidated High School District 230
, Ill. Educ. Labor Relations Bd. Op. 90-CA-0058-C, 7 PERI ¶1079 (June 19, 1991) [hereinafter 
Consolidated High School
], 
where the Board found the respondent school district would have discharged the subject employee even without his protected union activity.  The Board in that case relied on several factors, including (1) the employee's prior disciplinary record, (2) the school district's prior warnings to the employee about his misconduct, (3) testimony at the school board dismissal hearing focusing on that misconduct, and (4) the absence of prior allegations that the discharge was motivated by the employee's protected activity.  The District in the instant case notes that all those factors are present here.  The District points to Bove's history of misconduct and to the discipline and warnings he received because of it.  In addition, testimony at the November 12, 1996, School Board dismissal hearing focused on Bove's misconduct on the night of October 16, 1996.  Further, Bove presented no evidence or claims at that hearing that his discharge was motivated by anti-union animus.  The District thus argues that, just as in 
Consolidated High School
, those factors here show the District would have dismissed  Bove even without his union activity.  

However, 
Consolidated High School
 is inapposite to the instant case.  In 
Consolidated High School
, the discharged employee was neither a union officer nor an active or highly visible union adherent.  His protected union activity consisted essentially of two conversations with a coworker where he said he would consult the union about her work hours and temporary status.  The discharged employee, a school custodian, also had a history of misconduct that included alleged sexual harassment of female employees.  He allegedly made suggestive remarks and dropped his pants.  The Board in 
Consolidated High School
 found no evidence of systemic anti-union animus.  In addition, it held that any inference the employee was discharged for his protected activity was rebutted by substantial evidence that the school district was mainly concerned with the sexual harassment allegations against him.  The Board emphasized that the school district was confronted with a serious charge of sexual harassment and that it could have faced legal liability if it had not acted quickly to correct the situation.  In the instant case,  Bove's misconduct was far less serious than that in 
Consolidated High School
.  Moreover, Bove was an active union member and acting chief union steward.  In addition, the Board in the instant case did find evidence of anti-union animus.  The District's argument here that 
Consolidated High School
 is analogous is unpersuasive.   

The District contends that Romano's anti-union statements cannot be used to show anti-union motivation.  The District notes that Romano expressly denied making those statements.  However, neither the ALJ nor the Board credited those denials.   The District also contends that because Romano's first statement came nearly a year before Bove's dismissal, it was too remote in time to show the discharge was motivated by anti-union animus.  The District relies upon 
Hardin County Education Ass'n v. Illinois Educational Labor Relations Board
, 174 Ill. App. 3d 168, 528 N.E.2d 737 (1988). There the court affirmed the Illinois Educational Labor Relations Board's (the Board) finding that evidence of anti-union animus was too remote in time from a teacher's discharge, and that the petitioner association had not established a 
prima facie
 case. 
Hardin County
, 174 Ill. App. 3d at 182, 528 N.E.2d at 745. In upholding that decision, the court noted that alleged anti-union statements by School Board members came nearly four years before the teacher was dismissed, and thus were too remote to support the discriminatory discharge claim.  
Hardin County
, 174 Ill. App. 3d at 184, 528 N.E.2d at 747.  In the instant case, Romano's first statement came less than a year before Bove's discharge, and the Board did not find that statement too remote.  
Hardin County
 thus is inapposite.  The District also argues that because Romano's second statement came in spring 1997, 
after
 Bove had been fired, that statement says nothing about the School Board's motivation in November 1996 when the discharge took place.  Nevertheless, the Board here found otherwise, and the District cites no case to support its view.  Finally, the District argues that in any event Romano had nothing to do with the discharge of Bove and that his statements therefore cannot be used to show anti-union animus on the part of the School Board, the entity that terminated Bove.  Nevertheless, it is irrelevant whether Romano had a direct hand in Bove's dismissal.  The Board found that Romano's reference to "orders from across the street" showed the anti-union motivation was not limited to him. The Board's finding that Romano's statements showed anti-union animus was not against the manifest weight of the evidence.

The District also notes that the ALJ found School Board member Maros credible when he testified that neither he nor School Board member Deluca were looking for Bove the night they made their surprise visit to the school.  The District argues that the Board should have deferred to the ALJ's credibility determinations and that it was error for the Board to find that  Maros and Deluca "focused on" Bove the night of October 16, 1996.  While the Board normally gives great weight to an ALJ's credibility findings when they are based on demeanor (
University of Illinois
, 11 PERI ¶1019 at IX-68), nevertheless it is the Board, not the ALJ, that is the ultimate fact finder, even when it pertains to credibility of witnesses. 
Highland Park Convalescent Center, Inc. v. Illinois Health Facilities Planning Board
, 217 Ill. App. 3d 1088, 1092, 578 N.E.2d 92, 94 (1991).  

"Where an administrative agency is responsible for the decision, the agency is required to consider the findings of the hearing officer, but it is not bound to accept them.  Rather, the agency must make its own decision based upon the evidence in the record. [Citation.] The rule applies even when findings of fact depend on the credibility of witnesses, and it is the hearing officer who observes the witnesses."  
Highland Park Convalescent Center
, 217 Ill. App. 3d at 1092, 578 N.E.2d at 94.  

The District also challenges the Board's finding that Bove was not discharged until he became active in the Union.  The District argues there is no evidence that Bove was more active in the Union in 1996, the year of his discharge, than in previous years.
(footnote: 6)    Nevertheless, the Board found that Bove was the acting chief union steward during the 1996-97 school year.  Bove testified he took that position because the chief steward had retired.  The Board's implicit finding that Bove was more active in the Union in 1996 cannot be overturned unless it is against the manifest weight of the evidence, and we find that it is not. CONCLUSION 

For the foregoing reasons, we affirm the Board's finding that anti-union motivation was controlling in Bove's discharge and that the District violated section 14(a)(3) of the Act and (derivatively) section 14(a)(1).  Viewing the evidence in the light most favorable to the Board, we are unable to say that no rational trier of fact could have reached the same conclusion.  The Board's decision thus is not against the manifest weight of the evidence.  

Affirmed.

COUSINS, P.J., and McNULTY, J., concur. 
 

FOOTNOTES
1:
Where there is a dispute, that dispute is noted.  

2:
There is no indication in the record of Mr. Deluca's first name.  

3:
But see the analysis exposited in R. Aldisert, Winning on Appeal §5.06 at 61 (1992), wherein he states:

"Where the ultimate fact has been found by a judge, the reviewing court may not disturb, except for clear error, the basic-fact component in the mixed question of law and fact, but the appellate court is free to review the 'law' segment of the ultimate fact 
de novo
."  

4:
The District's brief actually states that the deadline was December 8, 1998, but that is undoubtedly a misprint.  

5:
The District also claims that at the time of Bove's discharge, it was combating a public perception that many of the custodians were not at work when they should have been, and thus were "feeding at the public trough."  The District asserts it had tried repeatedly to pass a tax-increase referendum but to no avail, and it was thus important to show the public that the District did not tolerate employees who shirked their responsibilities.  According to the District, that situation supports the legitimacy of its reason for terminating Bove.   

6:
The District also claims the incident where Bove was found not to be in the building but was not disciplined had been only recently reported at the time he was discharged several years later. The District thus contends it could not have been expected to discipline Bove for an incident that was not reported at the time it occurred. Even if the District is correct in that statement, it does not change our view that the Board's decision on this issue was not against the manifest weight of the evidence.